# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**
June 15, 2018

Lyle W. Cayce
Clerk

No. 17-40552

UNITED STATES OF AMERICA,

> Plaintiff–Appellee,

v.

KARL DOUGLAS SCOTT, also known as Fresh, also known as KD,

> Defendant–Appellant.

Appeal from the United States District Court
for the Southern District of Texas

Before SMITH, WIENER, and WILLETT, Circuit Judges.

DON R. WILLETT, Circuit Judge:

This case involves two failed attempts to transport marijuana[1] into the United States. Karl Scott first recruited Brittini Randle to sneak marijuana across the border from Mexico. Randle was arrested. Undeterred, Scott then enlisted Mark Cane, who fared no better. Same plan. Same checkpoint. Same result.

A jury convicted Scott of (1) conspiracy to possess marijuana with intent to distribute, and (2) aiding and abetting the possession of marijuana with intent to distribute. On appeal, Scott argues that the evidence was insufficient

---

[1] Although the statute uses the term "marihuana," this opinion uses "marijuana."

No. 17-40552

to support either conviction because he never exercised any dominion or control over the marijuana.

Scott's argument—no possession, no conviction—is uncomplicated. But it is also unavailing. Put bluntly, possession is not nine-tenths of the law.

We affirm.

## I. BACKGROUND

### A.    Brittini Randle & the July 8 Run

Randle met Scott in early 2014. Scott was a barber, and Randle was interested in becoming a hairdresser. Their friendship blossomed into a relationship. At some point, Scott asked Randle if she "knew anybody who would want to make a run." And by "run," he meant transport drugs across the border. After telling her that a driver would make about $1,500 or more, Randle volunteered. But Scott suggested that "it would look better if it was you and another person." So Randle asked her childhood friend, Heleniah Adams, to accompany her. The three then met in person to hash out the details.

About a week later, Randle and Adams met Scott at a gas station in Beaumont, Texas, where Scott bought them gas. Randle and Adams followed Scott to Houston where Scott picked up his uncle, Chris. The group then drove to Edmond Hadnot's house in Corpus Christi. Scott explained to Randle that Chris was supposed to drive an 18-wheeler. If they could fit all the drugs in the truck, Randle would not have to drive, but she would still get paid.

Hadnot, Scott, Chris, Adams, and Randle then put their plan into action. They drove to the Rio Grande Valley; Scott drove Hadnot and Chris in his car, and Randle took Adams in her car. The group enjoyed a night on the town, drinking first at a Buffalo Wild Wings and later, at a local strip club. They then stayed overnight in McAllen, where Scott, Adams, and Randle shared a hotel room.

No. 17-40552

The next morning, Hadnot called an audible. He told Randle that she would drive alone while Adams drove separately. Randle followed Hadnot and another man to a gas station, while Scott and Adams remained at the hotel. Hadnot and the man left Randle at the gas station, taking her car.

About an hour and a half later, Hadnot called Randle and told her to get into a different car with a different man. The man drove Randle to a residential neighborhood where she found her car waiting for her.

Hadnot called Randle and told her to follow him. Initially, Scott, Hadnot, Adams, and Randle had developed a cover story: Randle and Adams worked as exotic dancers who were "constantly traveling." But as the plan changed, so did the cover story. Randle was now a medical student. As such, Hadnot led Randle to Scrub Mart, purchased scrubs and a stethoscope, and instructed Randle to change. Randle did so and headed toward the Falfurrias Border Patrol Checkpoint.

As Randle drove north, the plan went south. While smoking a cigarette, Randle tried to roll down her front windows. But only the driver-side window worked. Randle became anxious. She was told that the marijuana would be concealed in her gas tank, but Randle now suspected it was in her door. Seeking reassurance, Randle exchanged multiple calls with both Hadnot and Scott. Scott told her to calm down, not to worry, and that it was okay. Randle hung up on Scott as she approached the Falfurrias Border Patrol Checkpoint.

Randle drove her car into the primary lane where a canine performed a free-air sniff and alerted. Based on the alert, a Border Patrol agent directed Randle to secondary inspection. The agent x-rayed the vehicle and detected three anomalies. Further search revealed bundles of marijuana in the car's doors and trunk. Ultimately, agents removed 62 bundles of marijuana from Randle's car with a net weight of 45.35 kilograms—nearly 100 pounds. Randle was arrested.

No. 17-40552

Randle initially followed the plan—that is to say, she lied. But she soon relented and told the Border Patrol agents "everything." After cooperating with the agents, Randle was released. She then called Scott who sent Hadnot's girlfriend to pick her up. Hadnot's girlfriend took Randle to Hadnot's house, and Scott and Adams met Randle in Scott's car. Once again, Randle lied. She told Scott and Adams she told the Border Patrol that she didn't know anything about the drugs. Scott then drove Adams and Randle back to Beaumont.

## B.     Mark Cane & the August 22 Run

Scott still had high hopes. A few months later, a mutual friend put Scott in touch with Mark Cane. The friend knew that Cane had a commercial driver's license (CDL) and that Scott wanted to transport marijuana using someone's CDL. Cane called Scott and arranged a meeting. Scott offered Cane $5,000, or alternatively ten pounds of marijuana, to transport 200 pounds of marijuana from the Rio Grande Valley through a border checkpoint. Cane hesitantly agreed.

Cane knew about Scott's drug-run history—specifically, Randle's "busted" smuggling attempt. Cane wanted to avoid Randle's fate. Scott gave Cane the same advice he gave Randle: If he was caught with the 200 pounds of marijuana at the check point, he should "play dumb," act like he didn't know it was in the truck, and they would let him go. But Cane was still unsure about whether he wanted to make the run. Scott knew Adams and Cane were good friends, so he asked Cane if he would like Adams to join him. Cane accepted, but he was still hesitant.

Once Cane was on board, Scott picked him up at his apartment in Beaumont. The pair traveled to Houston, picked up Adams, and headed to Hadnot's house in Corpus Christi. Cane was still uneasy—he peppered Scott and Adams with questions on the drive. He asked about the checkpoint and Randle's failed attempt. Scott and Adams told Cane to relax. They explained

4

No. 17-40552

that Randle "played like she didn't know nothing about [the marijuana] and . . . they let her go." They assured Cane that if he did the same, he too would be released.

At Hadnot's house, Hadnot, Adams, and Scott advised Cane about the specifics of the job and discussed previous runs. Hadnot told Cane that the truck he would drive had a secret compartment to store the marijuana. Hadnot and Scott also provided a cover story: Cane was picking up a one-time load from Corpus Christi to drop off in McAllen.

The next day, Scott drove Hadnot, Adams, and Cane to McAllen. On the way, they stopped at a Wal-Mart where Scott gave Cane money to buy a logbook, snacks, and a cooler to stage in Cane's 18-wheeler. Hadnot and Cane then left in Scott's car to pick up the 18-wheeler. Meanwhile, Scott and Adams waited for Hadnot and Cane at a Burger King.

Hadnot and Cane met two "Spanish guys" in a residential neighborhood to pick up the truck already loaded with marijuana. Hadnot gave Cane money for gas, and Cane followed Hadnot to a gas station. As Cane filled up, Hadnot left to pick up Adams and Scott.

Once Hadnot returned, Cane followed Scott's car, driven by Hadnot, onto the highway. Cane ended up following the wrong car, and he lost sight of Hadnot. Scott called Cane to redirect him. In fact, Scott talked to Cane multiple times before the checkpoint.

Eventually, Cane reached the Falfurrias Border Patrol Checkpoint. Hadnot drove Scott's car through the checkpoint, and Cane drove the truck to the primary inspection lane. Once Cane stopped, an agent conducted a free-air sniff with his canine—and the predictable happened. Once again, the canine alerted, and the agent referred Cane to secondary inspection. Agents searched the truck and found marijuana "in plain sight." All told, agents found 29

bundles of marijuana with a net weight of 175.46 kilograms[2]—nearly 550 pounds. Cane tried to "play dumb like [Scott and Adams] told [him]," but to no avail—like Randle, he was arrested.

The joint conspiracy had failed.

## C.    Indictment & Plea

Cane identified his four co-conspirators—Randle, Hadnot, Scott, and Adams—from a photo lineup, and they were subsequently charged[3] with two offenses: (1) conspiracy to possess with intent to distribute more than 100 kilograms (specifically, 220.81 kilograms[4]) of marijuana between June 1, 2014 and August 22, 2014 in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(B) (Count One), and (2) aiding and abetting possession with intent to distribute less than 50 kilograms of marijuana (specifically, 45.35 kilograms) on July 8, 2014 in violation of 21 U.S.C. § 841(a)(1), (b)(1)(D) and 18 U.S.C. § 2 (Count Two).

Randle pleaded guilty to Count One. Hadnot, Scott, and Adams, however, pleaded not guilty and proceeded to trial.

## D.    Trial & Conviction

At trial, the Government relied on testimony from Randle and Cane to establish the details of the conspiracy. The Government emphasized Scott's role in recruiting Randle and Cane to be drivers. Randle testified about her involvement with Adams, Scott, and Hadnot to transport more than 45

---

[2] Gross weight is the weight of the controlled substance plus packaging, wrappings, or masking agents. Agents found a gross weight of 249.26 kilograms of marijuana in Cane's truck with a net weight of 175.46 kilograms.

[3] Cane was charged in a separate indictment. He pleaded guilty to conspiracy to possess with intent to distribute more than 100 kilograms of marijuana (specifically, a gross weight of 249.26 kilograms).

[4] 220.81 kilograms represents the total net weight of the two failed transport attempts: Randle attempted to transport a net weight of 45.35 kilograms, and Cane attempted to transport a net weight of 175.46 kilograms.

kilograms of marijuana through the Falfurrias checkpoint on July 8, 2014. Cane also testified about his role to transport more than 100 kilograms through the checkpoint on August 22, 2014. The Government corroborated their testimony with cell-phone records and testimony by investigators. Adams, Scott, and Hadnot did not testify or otherwise present any witnesses.

At the close of the Government's case, Scott moved for acquittal under Federal Rule of Criminal Procedure 29(a). Scott disputed both counts in the indictment, arguing that he could not be guilty because he never actually or constructively possessed any marijuana. He also argued that Randle and Cane bore sole responsibility for the dubious scheme because they had exclusive possession of the marijuana and would receive all the profit. The court denied Scott's motion.

Scott re-urged these possession points in his closing argument.

A jury found Adams, Scott, and Hadnot guilty on both counts. The jury also found by special verdict that Hadnot and Scott knew or reasonably should have known that the conspiracy involved at least 100 kilograms of marijuana. The court sentenced Scott to 60 months of imprisonment on each count, to be served concurrently, followed by five years of supervised release on each count. Scott timely appealed his convictions.

## II. DISCUSSION

Scott contends the evidence was legally insufficient to support his convictions for (1) conspiracy to possess marijuana with intent to distribute more than 100 kilograms of marijuana (Count One), and (2) aiding and abetting the possession with intent to distribute less than 50 kilograms of marijuana (Count Two). As at trial, Scott argues that "there was insufficient evidence to prove Scott had any possession, actual or constructive, of the marihuana discovered in the vehicles of Randle and Cane."

7

No. 17-40552

Scott preserved his challenge by moving for acquittal under Rule 29(a).[5] We review preserved challenges to the sufficiency of the evidence de novo, but we are "highly deferential to the verdict."[6] "When reviewing the sufficiency of the evidence, we view all evidence, whether circumstantial or direct, in the light most favorable to the government, with all reasonable inferences and credibility choices to be made in support of the jury's verdict."[7] We do not delve into the evidentiary weeds: The jury "retains the sole authority to weigh any conflicting evidence and to evaluate the credibility of witnesses."[8]

"A conviction, especially one accompanied by an accomplice instruction, may be sustained on the uncorroborated testimony of an accomplice so long as 'the testimony is not incredible or otherwise insubstantial on its face.'"[9] "Testimony is incredible as a matter of law only if 'it relates to facts that the witness could not possibly have observed or to events which could not have occurred under the laws of nature.'"[10] Evidence is sufficient to support a conviction if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."[11] Our "inquiry is limited to whether the jury's verdict was reasonable, not whether we believe it to be correct."[12]

---

[5] *See United States v. Jimenez-Elvirez*, 862 F.3d 527, 533 (5th Cir. 2017).

[6] *United States v. Velasquez*, 881 F.3d 314, 328 (5th Cir. 2018) (per curiam) (quoting *United States v. Beacham*, 774 F.3d 267, 272 (5th Cir. 2014)).

[7] *United States v. Ford*, 558 F.3d 371, 375 (5th Cir. 2009) (per curiam) (citing *United States v. Salazar*, 958 F.2d 1285, 1290–91 (5th Cir. 1992)).

[8] *United States v. Grant*, 683 F.3d 639, 642 (5th Cir. 2012) (quoting *United States v. Loe*, 262 F.3d 427, 432 (5th Cir. 2001)).

[9] *United States v. Suarez*, 879 F.3d 626, 631 (5th Cir. 2018) (quoting *United States v. Arledge*, 553 F.3d 881, 888 (5th Cir. 2008)).

[10] *United States v. Booker*, 334 F.3d 406, 410 (5th Cir. 2003) (quoting *United States v. Bermea*, 30 F.3d 1539, 1552 (5th Cir. 1994)).

[11] *United States v. Oti*, 872 F.3d 678, 686 (5th Cir. 2017) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

[12] *United States v. Alaniz*, 726 F.3d 586, 601 (5th Cir. 2013) (quoting *United States v. Moreno-Gonzalez*, 662 F.3d 369, 372 (5th Cir. 2011)).

## A.    Conspiracy

Count One charged Scott with conspiring to possess with intent to distribute more than 100 kilograms of marijuana, specifically 220.81 kilograms, between June 1, 2014, and August 22, 2014. A conviction for a drug conspiracy requires proof of "(1) an agreement between two or more persons to violate the narcotics laws, (2) the defendant's knowledge of the agreement, and (3) the defendant's voluntary participation in the conspiracy."[13] "The agreement may be tacit, and the jury may infer its existence from circumstantial evidence."[14] The Government must also prove beyond a reasonable doubt that the quantity of marijuana was at least 100 kilograms.[15]

Scott does not dispute that there was an unlawful agreement, that he knew of the agreement, or that he voluntarily participated in the conspiracy. In fact, Scott acknowledges his role. Nor does Scott dispute the amount of marijuana involved. Scott's only argument is that "the government presented no proof establishing his clear exercise of control of or dominion over the marihuana placed in Randle and Cane's vehicles." In essence, he contends the Government has not shown that he possessed the marijuana, so insufficient evidence supports his conviction for conspiracy to *possess* with intent to distribute.

But possession is not an element of a drug conspiracy under 21 U.S.C. § 846.[16] Although Scott was never in possession of the marijuana, the evidence

---

[13] *Booker*, 334 F.3d at 409 (citing *United States v. Gallardo-Trapero*, 185 F.3d 307, 316–17 (5th Cir. 1999)).

[14] *United States v. Crooks*, 83 F.3d 103, 106 (5th Cir. 1996).

[15] *See United States v. Reyes*, 300 F.3d 555, 559 (5th Cir. 2002).

[16] *See Booker*, 334 F.3d at 409.

establishes—as Scott admits—a concerted action among Scott, Hadnot, and Adams to transport marijuana through the checkpoint.[17]

Ample evidence supports Scott's conspiracy conviction. Testimony from Randle and Cane revealed Scott's role in the conspiracy.[18] Scott recruited both Randle and Cane to "make a run" through the checkpoint. Randle testified that she agreed with Adams, Scott, and Hadnot to smuggle roughly 45 kilograms of marijuana through the checkpoint on July 8, 2014. Scott then met Randle and Adams to discuss specifics. The three drove to Hadnot's house, where he helped develop a cover story, and ultimately to the Rio Grande Valley. And Scott calmed Randle as she approached the checkpoint: During the run, he was in constant contact with her through phone calls and text messages.

Cane testified that he agreed with Adams, Scott, and Hadnot to smuggle more than 200 kilograms of marijuana through the checkpoint on August 22, 2014. Scott met with Cane to discuss the details of the job, including payment and Randle's "busted" drug run. When Cane was hesitant, Scott had Adams contact Cane to convince him to join the scheme. Scott also advised Cane about his upcoming run on the way to Hadnot's house. After Cane picked up the truck loaded with marijuana, he followed a car driven by Hadnot containing Scott and Adams as passengers. Scott traveled with them to Hadnot's house and later to the Rio Grande Valley. He gave Cane money to buy a logbook, snacks, and a cooler to stage the truck that Cane would be driving. Scott was also in constant contact with Cane via phone and text message.

Finally, Daniel Ramos, a Corpus Christi police officer assigned as a task force officer with the Drug Enforcement Administration, testified about the amount of marijuana seized.

---

[17] *See Salazar*, 958 F.2d at 1291–92 (reviewing evidence and finding it sufficient for a conviction under § 846).

[18] *See Booker*, 334 F.3d at 410.

No. 17-40552

Based on the above evidence, a rational trier of fact could have found beyond a reasonable doubt that Scott formed an agreement with Adams, Hadnot, Randle, and Cane to transport marijuana, that he knew of the agreement, and that he voluntarily participated in the agreement.

Scott's conspiracy challenge is without merit.

## B.     Aiding & Abetting

Scott also challenges his conviction for aiding and abetting on similar grounds. Count Two charged Scott with aiding and abetting Randle in her possession with intent to distribute 45.35 kilograms of marijuana.

"The crime of aiding and abetting occurs when the defendant associates with a criminal venture, purposefully participates in it, and seeks by his actions to make it succeed."[19] A conviction for aiding and abetting requires proof that "the substantive offense occurred and that the defendant (1) associated with the criminal venture; (2) purposefully participated in the crime; and (3) sought by his actions for it to succeed."[20] The Government thus must prove that Scott "aided and abetted both the possession of [marijuana] and the intent to distribute it."[21] But a defendant need not commit each element of the substantive offense, so long as he aided and abetted each element.[22] Importantly, the defendant "need not have actual or constructive possession of the drugs to be guilty of aiding and abetting possession with intent to distribute."[23]

---

[19] *Salazar*, 958 F.2d at 1292 (quoting *United States v. Vaden*, 912 F.2d 780, 783 (5th Cir. 1990)).

[20] *United States v. Pando Franco*, 503 F.3d 389, 394 (5th Cir. 2007).

[21] *United States v. Williams*, 985 F.2d 749, 753 (5th Cir. 1993) (citing *United States v. Lindell*, 881 F.2d 1313, 1322 (5th Cir. 1989)).

[22] *United States v. Fischel*, 686 F.2d 1082, 1087–88 (5th Cir. 1982); *see also United States v. Zapata-Alvarez*, 911 F.2d 1025, 1026–27 (5th Cir. 1990) (per curiam).

[23] *Williams*, 985 F.2d at 735; *see also United States v. Pena*, 949 F.2d 751, 755 (5th Cir. 1991).

No. 17-40552

Scott's aiding and abetting charge was based on Randle's failed attempt to transport marijuana through the checkpoint. Scott acknowledges that he accompanied Randle to the Rio Grande Valley, where the marijuana was loaded into her car. But he points to Hadnot as the man responsible for the transaction. Scott was neither present when the marijuana was obtained nor involved in preparing Randle's vehicle to cross the checkpoint. Scott does not dispute that the underlying offense occurred—he argues that the evidence is insufficient because he did not participate "in the possession aspect of the transaction."

For support, Scott cites *United States v. Jackson*.[24] In that case, Jackson introduced two co-defendants who independently arranged a sale of cocaine to DEA agents.[25] This court found that "[a]lthough [Jackson] was not present at the actual sale, he helped set up the transaction, was aware of all the circumstances, and intended that the illegal venture succeed."[26] But there was no evidence that Jackson helped his co-defendants obtain the cocaine or that he exercised any control over the drug.[27] Thus, "[t]here was no participation . . . in the possession aspect of the transaction" to support a conviction for aiding and abetting possession with intent to distribute.[28] Scott argues that, like Jackson, he was aware of the circumstances of the illegal venture and helped it succeed, but he in no way aided Randle's possession of marijuana. Scott's argument fares no better than Randle's failed run.

---

[24] *See* 526 F.2d 1236 (5th Cir. 1976).
[25] *Id.* at 1237.
[26] *Id.* at 1238.
[27] *Id.*
[28] *Id.*

No. 17-40552

To be sure, there is no evidence that Scott actually or constructively possessed the contraband—a relevant factor in our aiding and abetting cases.[29] But the Government is not required to prove actual or constructive possession in aiding and abetting cases.[30] Aiding and abetting merely requires that the defendant's association and participation in a venture were calculated to bring about the venture's success.[31] "Typically, the same evidence will support both a conspiracy and an aiding and abetting conviction."[32] This is such a case.

Unlike in *Jackson*, where Jackson's co-defendants independently arranged the sale of cocaine, Scott knew the details of the scheme. He recruited Randle to drive the marijuana across the checkpoint by telling her how much money she could make, discussed the plan with her on multiple occasions, and even helped her concoct a cover story. Scott then accompanied Randle to the Rio Grande Valley and shared a hotel room with her the night before marijuana was loaded into her car.[33] Scott also drove Hadnot to the Valley where Hadnot coordinated to load the marijuana into Randle's car. Once

---

[29] *See, e.g.*, *id.* at 1237–38 (reversing conviction where there was no evidence that the defendant helped obtain cocaine or exercised control over it); *Fischel*, 686 F.2d at 1088–89 (finding sufficient evidence where the defendant encouraged and negotiated the sale of cocaine but did not possess it).

[30] *Pena*, 949 F.2d at 755.

[31] *See Williams*, 985 F.2d at 753; *Fischel*, 686 F.2d at 1089 ("Fischel need not have pulled the cocaine from his own pocket and maintained total control over it until the consummating of the sale . . . . Fischel need only have helped [the principal's] possession.").

[32] *United States v. Singh*, 922 F.2d 1169, 1173 (5th Cir. 1991). *See also United States v. Tenorio*, 360 F.3d 491, 494–95 (5th Cir. 2004) ("'The evidence supporting a conspiracy conviction typically supports an aiding and abetting conviction.' . . . Therefore we consider the sufficiency of the jury verdicts on both the conspiracy and aiding and abetting charges together." (quoting *United States v. Montgomery*, 210 F.3d 446, 450 (5th Cir. 2000))).

[33] *See United States v. Ceballos-Amaya*, 470 F. App'x 254, 260 (5th Cir. 2012) (per curiam) (unpublished) (finding sufficient evidence to support aiding and abetting with intent to distribute where defendant assisted in recruiting a driver to transport marijuana and watched him in the motel while he waited for the truck to drive the marijuana); *United States v. Garcia-Aleman*, 14 F.3d 54, at *1 (5th Cir. 1994) (per curiam) (unpublished) (finding that bringing a man with a large amount of heroin to meet a purchaser "facilitated the distribution of heroin").

No. 17-40552

Randle possessed the marijuana, Scott coaxed her through the checkpoint when she became nervous. But for Scott's actions, Randle would never have come into possession of the marijuana—unlike the drug dealers in *Jackson*, who obtained the cocaine independently of Jackson's efforts.[34]

Viewing this evidence in the light most favorable to the jury verdict, we cannot say that *no* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.[35] Scott associated with a criminal venture. He ensured Randle possessed marijuana in order to transport it across the border, purposefully participated in the venture, and sought by his actions to make the venture succeed.

Scott's aiding-and-abetting challenge is likewise meritless.

### III. CONCLUSION

The evidence, viewed as a whole and in the light most favorable to the jury verdict, is sufficient to prove the crimes charged beyond a reasonable doubt.

We AFFIRM Scott's conviction.

---

[34] *See Jackson*, 56 F.2d at 1237–38.
[35] *See Oti*, 872 F.3d at 686.