# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 18-60455

United States Court of Appeals
Fifth Circuit

**FILED**
September 13, 2019

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

　　　　Plaintiff - Appellee

v.

ALBERT DIAZ, M.D.,

　　　　Defendant - Appellant

Appeals from the United States District Court
for the Southern District of Mississippi
USDC No. 2:17-CR-31-1

Before STEWART, Chief Judge, and JONES and OWEN, Circuit Judges.

PER CURIAM:*

Following a five-day jury trial, Albert Diaz was convicted on various counts of healthcare fraud, distribution of controlled substances, and obstruction of justice. He was sentenced to 42 months of imprisonment and ordered to pay more than $3 million in restitution. He now appeals his convictions and the restitution order. We affirm.

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 18-60455

## I. Factual & Procedural Background

In October 2014, Gerald Schaar, a pharmaceutical sales representative for Advantage Pharmacy[1] ("Advantage"), approached Albert Diaz, a practicing physician with clinics in Biloxi and Ocean Springs, Mississippi, and asked Diaz to write prescriptions for specific compounded medications. The prescriptions would be written to patients whose personal identification information was provided to Schaar by Randy Thomley, an employee of a marketing company for Advantage. Diaz agreed to write the prescriptions with the knowledge that Schaar would receive a commission when each prescription claim was paid by the health care benefit administrator. The primary benefit administrator was Tricare, a Department of Defense health care program providing coverage to members of the military and their families. From October 2014 through September 2015, Diaz wrote multiple prescriptions that resulted in the filing of 573 false claims, totaling more than $2.3 million in payments from Tricare and over $1 million in payments from private insurance companies. The fraudulent prescriptions Diaz wrote included prescriptions for an ointment containing ketamine, a Schedule III controlled substance used for pain.

In December 2015, Diaz received an audit letter from Tricare, inquiring about specific claims related to the prescriptions he had written for Schaar. After receiving the letter, Diaz asked Schaar to arrange for him to see the patients who had received the prescriptions he had written so that he could create a medical chart showing that he had examined them. In January 2016, Diaz and Schaar traveled to Hattiesburg, Mississippi on a Saturday to meet with Thomley and make house calls to see the patients. Diaz then created

---

[1] Advantage was a compounding pharmacy that operated out of Hattiesburg, Mississippi.

medical charts with either backdated or omitted dates to conceal the fact that he had not examined the patients before writing the prescriptions.[2]

Over the course of 2016 and 2017, Diaz made multiple false statements to federal agents during the investigation of the offense to conceal his involvement. In September 2016 and January 2017, investigators recorded two conversations between Diaz and Schaar, who was cooperating with investigators. In the recordings Diaz admitted that he had prescribed the compounded medications without first seeing the patients and had subsequently engaged in a coverup to escape culpability.

In October 2017, a federal grand jury charged Diaz with multiple counts of health care and wire fraud, controlled substance (*i.e.*, ketamine) distribution and dispensing, and obstruction of justice, including conspiracy offenses. The week before trial, Diaz sought a third continuance on grounds that the government had belatedly disclosed discovery and impeachment material related to Schaar. The district court denied the motion and the case proceeded to trial.

Following a five-day jury trial, Diaz was convicted of conspiracy to commit health care and wire fraud, substantive wire fraud, conspiracy to distribute a controlled substance, distribution of controlled substances, conspiracy to obstruct justice by falsifying medical records, and multiple substantive obstruction of justice offenses. Although Diaz had been on pretrial release, he was detained following his conviction, and the district court denied his request for bail pending sentencing. The district court also denied Diaz's motions for a new trial and for bond pending appeal.

---

[2] Prior to creating the backdated charts, Diaz had provided blank charts to Schaar, which Schaar gave to Thomley to gather the information contained in the medical files submitted in support of the false claims.

No. 18-60455

On October 16, 2018, four months after Diaz had lodged his appeal with this court, the district court, on receiving the required financial information from Diaz, amended its judgment to include restitution in the amount of $3,374,409.16. Two months later in December 2018, Diaz moved this court for release pending appeal which was denied on January 28, 2019. The record indicates that Diaz did not file a second notice of appeal after the district court amended its judgment to include restitution.

Diaz advances seven issues on appeal. We address each in turn.

## II. Discussion

### A. Sufficiency of the Evidence

Diaz challenges his convictions for conspiracy to commit health care fraud or wire fraud, in violation of 18 U.S.C. § 1349, and substantive wire fraud, in violation of 18 U.S.C. §§ 1343 and 2. He also challenges his convictions for obstruction of justice and conspiracy to distribute a controlled substance outside the scope of medical practice and not for a legitimate medical purpose.

"We review preserved challenges to the sufficiency of the evidence de novo, but we are 'highly deferential to the verdict.'" *United States v. Scott*, 892 F.3d 791, 796 (5th Cir. 2018) (citation omitted). "When reviewing the sufficiency of the evidence, we view all evidence, whether circumstantial or direct, in the light most favorable to the government, with all reasonable inferences and credibility choices to be made in support of the jury's verdict." *Id.* It is the province of the jury to "weigh any conflicting evidence and to evaluate the credibility of witnesses." *Id.* at 797. We consider the evidence "sufficient to support a conviction if '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* (emphasis in original) (citation omitted). Our question is whether "the jury's verdict was reasonable, not whether we believe it to be correct." *Id.*

No. 18-60455

We have reviewed the voluminous record in this case and conclude that sufficient evidence was presented at trial to support Diaz's multiple convictions. *Id*. The jury's verdict was reasonable. *Id*.

B. *Constructive Amendment*

We conduct a de novo review of Diaz's claim that the government constructively amended the indictment. *See United States v. Thompson*, 647 F.3d 180, 183 (5th Cir. 2011). "[T]he two primary functions of an indictment are that it (1) provides notice of the crime for which the defendant has been charged, allowing him the opportunity to prepare a defense; and (2) interposes the public into the charging decision, such that a defendant is not subject to jeopardy for a crime alleged only by the prosecution," meaning that he is protected against subsequent prosecution for the same offense. *United States v. Robinson*, 367 F.3d 278, 287 (5th Cir. 2004) (citations omitted). "A constructive amendment occurs when the government changes its theory during trial so as to urge the jury to convict on a basis broader than that charged in the indictment, or when the government is allowed to prove an essential element of the crime on an alternative basis permitted by the statute but not charged in the indictment." *United States v. Girod*, 646 F.3d 304, 316 (5th Cir. 2011) (internal quotation marks and citation omitted). "Not all variations between allegation and proof, however, rise to the level of a constructive amendment and thus violate this rule." *Thompson*, 647 F.3d at 184.

Although Diaz argues otherwise, nothing in the evidence presented at trial or in the government's closing argument modified an essential element of the offenses with which he was charged. On the health care and wire fraud charges, the indictment alleged that Diaz and others devised a scheme to defraud Tricare for financial gain. The evidence established at trial, and the government argued, that Diaz, Schaar, Thomley, and others agreed to issue

5

medically unnecessary compounded medication prescriptions to Tricare beneficiaries and submit those prescriptions for reimbursement to Tricare. The government's statement that Diaz was not compensated for his participation in the scheme did not modify or expand the basis on which the jury could convict him. Rather, it clarified that Diaz's personal financial gain was not required to prove the charge that he conspired with others to commit health care fraud—a correct statement of the applicable law. *See United States v. Ganji*, 880 F.3d 760, 767 (5th Cir. 2018) ("To support a conviction under 18 U.S.C. § 1349, the Government must prove beyond a reasonable doubt that: '(1) two or more persons made an agreement to commit health care fraud; (2) that the defendant knew the unlawful purpose of the agreement; and (3) that the defendant joined in the agreement . . . with the intent to further the unlawful purpose.'" (citation omitted)).

On the obstruction of justice charges, the indictment alleged that Diaz falsified and backdated patient records and submitted them to Tricare to cover up the fact that he authorized the compounded prescriptions without examining any of the Tricare beneficiaries. The evidence established at trial, and the government argued, that Diaz coordinated with Schaar and Thomley to drive to Hattiesburg to examine the Tricare beneficiaries for the purpose of creating falsified and backdated patients records in response to the Tricare audit. To the extent, if any, that the government relied at trial on Diaz's statements to investigators that he had lied and falsified the records to cover up his participation in the scheme, this did not expand or modify the factual basis upon which the jury was permitted to convict on the obstruction of justice charges. Diaz's claims that the government constructively amended the indictment fail. *See Girod*, 646 F.3d at 316.

*C. Jury Bias*

This court reviews a district court's denial of a motion for a new trial on the basis of juror bias for abuse of discretion. *See United States v. Thomas*, 627 F.3d 146, 161 (5th Cir. 2010). The Sixth Amendment guarantees criminal defendants the right to trial by an impartial jury. *See Solis v. Cockrell*, 342 F.3d 392, 395 (5th Cir. 2003). "A defendant may show either actual or implied juror bias." *Thomas*, 627 F.3d at 161. Actual bias can be shown through admission or factual proof and "exists when a juror fails to answer a material question accurately because he is biased." *Id.* (citation omitted). "Juror bias may also be implied in 'extreme circumstances,' as in 'when the juror is employed by the prosecuting agency, is a close relative of a participant in the trial, or is somehow involved in the transaction that is the subject of the trial.'" *Id.* (citation omitted).

After the jury instruction conference on the final day of trial, a Court Security Officer informed the district court's staff that Juror 1 was upset and crying in the bathroom because she believed she had been threatened by Diaz's family. In response, the district court sequestered Juror 1 from the rest of the jury and began an inquiry. She ultimately stated that nobody actually threatened her and that she had told the other jurors that she felt "uncomfortable going out of the courthouse" but she denied attributing her discomfort to Diaz. The district court then excused Juror 1 from jury service.

To determine whether the jury had been tainted, the district court examined each juror under oath and gave counsel for both sides an opportunity to question each of them. In denying Diaz's motion for a new trial, the district court stated that after interviewing each individual juror, he determined that

> every other juror believed that Juror 1 was paranoid
> and overreacted, and none of them actually believed
> that [Diaz] or anyone associated with him had followed

> her, spoken to her, or done anything to intimidate her. None of the remaining jurors attributed Juror 1's discomfort to [Diaz] or anyone associated with him, and each one affirmed under oath that these events had no effect on their ability to be fair to each side and render an impartial verdict.

The district court further declined to impute bias to the jury noting that "[t]his case is wholly dissimilar to ones where the Fifth Circuit has imputed implied bias to a jury. None of the remaining jurors were employees of the prosecuting agency, close relatives of anyone associated with the trial, or involved in the criminal transactions that were the subject of the trial."

Diaz argues that Juror 1's statements to the other jurors created implied jury bias against him and violated his right to due process and trial by an impartial jury. We disagree. The district court took adequate steps to ensure that the jury that rendered the verdict in Diaz's case was not impliedly biased against him. The district court ensured that Juror 1's statements and subsequent dismissal from the jury did not taint the remaining jurors or jeopardize his right to a fair trial. We agree with the government that, while the remaining jurors' reassurances that they could be fair to both sides is "not controll[ing]" under *Brooks v. Dretke*, 418 F.3d 430, 434 (5th Cir. 2005), it does support the conclusion that this is not an "extreme situation" warranting a finding of implied juror bias. *See Thomas*, 627 F.3d at 161 ("Juror bias may also be implied in 'extreme circumstances,' as in 'when the juror is employed by the prosecuting agency, is a close relative of a participant in the trial, or is somehow involved in the transaction that is the subject of the trial.'"). The district court did not abuse its discretion in denying his motion for a new trial on this issue. *See id.* at 161.

*D. Recordings*

As noted, prior to Diaz's trial, Schaar pled guilty to conspiring to commit health care fraud and agreed to cooperate with the government. At the government's request, Schaar recorded two conversations with Diaz at his clinic in Biloxi. The first recorded conversation between Schaar and Diaz took place in September 2016. In that conversation, Diaz discussed authorizing compounded medication prescriptions without examining the patients first and falsifying patient records to cover it up. In that recording, Diaz asks Schaar, "So what's your attorney saying?" Schaar also asks Diaz if he had talked to his own attorney and Diaz replies that his attorney "hadn't heard anything" but did not go into further detail about his communications with his attorney. The second recording took place in Diaz's office in late January 2017 after Diaz asked Schaar to meet with him. During this conversation, Diaz showed Schaar a text that he had received from his own attorney stating that IRS investigators wanted to interview Diaz about the Tricare audit. Diaz told Schaar, "I'm not gonna say that you filled out the [prescription] forms." Diaz further states, "You see cause I'm not, I'm not supposed to sign a prescription unless I've seen and examined the patient. And I signed the prescription without seeing them." Diaz then states to Schaar, "Don't volunteer [Thomley's name]. Don't say anything, just answer the questions and have an attorney cause if you don't. Cause that will keep you out of trouble." The district court denied Diaz's motions seeking to exclude the recordings. The district court also denied Diaz's request for an evidentiary hearing before trial and his subsequent motion for a new trial.

Diaz argues that the government violated his Sixth Amendment right to counsel by directing Schaar to record conversations he had with Diaz while Diaz was represented by counsel. He also argues that, because he is alleging

"prosecutorial misconduct" or "government misconduct," the district court erred in not holding an evidentiary hearing on the matter.

This court reviews constitutional claims, like Diaz's Sixth Amendment right to counsel claim, de novo. *See United States v. Hernandez*, 633 F.3d 370, 373 (5th Cir. 2011). We review the district court's denial of Diaz's request for an evidentiary hearing for abuse of discretion. *See Thompson v. Davis*, 916 F.3d 444, 455 (5th Cir. 2019). A governmental intrusion "through surreptitious electronic means or through an informant" upon "the confidential relationship between a criminal defendant and his attorney" violates the Sixth Amendment right to counsel. *United States v. Zarzour*, 432 F.2d 1, 3 (5th Cir. 1970). The Supreme Court held in *Rothgery v. Gillespie Cty., Tex.*, 554 U.S. 191, 198 (2008) that the Sixth Amendment right to counsel attaches when "prosecution is commenced." There, the Court explained that commencement means "the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *Id.* To prevail on a claim that the government has invaded the attorney-client privilege, the defendant must establish that prejudice resulted. *See United States v. Davis*, 226 F.3d 346, 353 (5th Cir. 2000); *see also Weatherford v. Bursey*, 429 U.S. 545, 558 (1977) (determining that there was no Sixth Amendment violation where there was "no tainted evidence in this case, no communication of defense strategy to the prosecution, and no purposeful intrusion by [the federal agent]").

Mississippi Rule of Professional Conduct 4.2 provides that "[i]n representing a client, a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so." MISS. CODE OF PROF'L CONDUCT R. 4.2. This rule

is common among many states and is often referred to as the "no-contact rule." 28 U.S.C. § 530B(a) provides that "[a]n attorney for the Government shall be subject to State laws and rules, and local Federal court rules, governing attorneys in each State where such attorney engages in that attorney's duties, to the same extent and in the same manner as other attorneys in that State." In the context of § 530B, however, this court has determined that "[state bar] professional disciplinary rules do not apply to government conduct prior to indictment . . . and certainly do not apply to the indiscretions of a non-attorney government informant." *United States v. Johnson*, 68 F.3d 899, 902 (5th Cir. 1995).

At the point in the investigation when the recordings took place in 2016 and 2017, Diaz had retained counsel, but prosecution had not yet commenced. *See Rothgery*, 554 U.S. at 198. Although the government was in the investigatory phase, there had been no "initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *Id.* The record indicates that a grand jury subpoena issued to Diaz on October 5, 2017—approximately nine months after the second (and last) recording took place. Thus, his Sixth Amendment argument fails under *Rothgery*.

Moreover, as the district court notes, Diaz "misrepresented the factual record" by suggesting that Schaar had "repeatedly" questioned him about attorney-client privileged information when that was not true—Schaar did not question Diaz as to any of his communications with his attorney and Diaz did not disclose any such information.[3] Consequently, because Diaz did not

---

[3] The record reveals that Schaar stated, "Have you talk [sic] to your attorney?" Diaz replied, "Yeah, I get a bill from him all the time," to which Schaar replied, "And he's saying nothin'?" to which Diaz responds, "[His attorney] hadn't heard anything." There is no further questioning directed at Diaz from Schaar regarding Diaz and his attorney's conversations.

disclose any privileged information, he would be unable to establish prejudice. *See Davis*, 226 F.3d at 353; *Weatherford*, 429 U.S. at 558.

With respect to Diaz's implications that the government violated Mississippi's professional or ethical rules, specifically Mississippi Rule of Professional Conduct 4.2, there is no Fifth Circuit precedent holding that a government's use of a coconspirator to record conversations with a subject of investigation in a non-custodial, pre-indictment setting constitutes a violation of a state bar's no-contact rule. Further, this court has clarified that "professional disciplinary rules do not apply to government conduct prior to indictment." *See Johnson*, 68 F.3d at 902.

Finally, the district court correctly determined that there was no need for an evidentiary hearing prior to trial because the issue of the recordings presented legal questions, and Diaz had "not articulated any factual disputes" for the district court to resolve. *See United States v. Fields*, 565 F.3d 290, 298 (5th Cir. 2009) ("We have held that '[t]he district court need not hold an evidentiary hearing to resolve ineffective assistance claims where the petitioner has failed to allege facts which, if proved, would admit of relief. If, on the record before us, 'we can conclude as a matter of law that [the petitioner] cannot establish one or both of the elements necessary to establish his constitutional claim, then an evidentiary hearing is not necessary and we may affirm.'" (internal citations omitted)). Although Diaz disputed the legal significance of the recordings, he did not, and could not, dispute their content. Thus, no factual dispute existed warranting the district court's consideration of his request for an evidentiary hearing and Diaz's arguments to the contrary are unavailing. *See Fields*, 565 F.3d at 298.

*E. Motion to Continue*

On February 23, 2018, the Friday before trial, Diaz orally moved to continue the trial arguing that the government had recently disclosed

information that Schaar had been treated for substance abuse and mental health issues. Diaz also claimed that the government had recently disclosed a report that revealed that Schaar said that other unidentified employees had stamped the Advantage prescriptions. Diaz claimed he needed to identify five additional witnesses to address the stamp issue. The government opposed Diaz's motion and the district court, after hearing from counsel for both sides, denied the motion. Diaz argues on appeal that this was error. We do not agree.

This court reviews a district court's denial of a motion to continue for abuse of discretion. *See Squyres v. Heico Cos., L.L.C.*, 782 F.3d 224, 236–37 (5th Cir. 2015). "In reviewing the denial of a continuance, this court looks to the 'totality of the circumstances,' including (a) the amount of time available; (b) the defendant's role in shortening the time needed; (c) the likelihood of prejudice from denial; (d) the availability of discovery from the prosecution; (e) the complexity of the case; (f) the adequacy of the defense actually provided at trial; and (g) the experience of the attorney with the accused." *United States v. Walters*, 351 F.3d 159, 170 (5th Cir. 2003).

Prior to Diaz's oral continuance motion on February 23rd, the district court had granted two other continuance motions that he had filed. In denying Diaz's third continuance motion the district court observed that Diaz's able and experienced attorneys had obtained a copy of Schaar's original guilty plea colloquy from July 2017 where he disclosed his substance abuse issues, so they could not feign surprise four days before trial as to their existence. As to Schaar's mental health, the district court commented that "being bipolar doesn't necessarily make someone incompetent" and regardless, while Diaz may choose to more heavily cross- examine Schaar on the issue, his condition was not a surprise to the defense. The district court further observed that the signature stamps could not have been a surprise since Diaz had proffered a

13

primary defense of not personally signing the prescriptions as far back as the previous August and the government sent discovery via email on January 25th with copies of the stamped signatures on the prescriptions.

We conclude that the district court's evaluation of the continuance motion was proper. It considered the "totality of the circumstances," specifically addressing Diaz's prior knowledge of both issues that he argued warranted the continuance, the experience and ability of all defense counsel, and perhaps most significantly, the low chance of prejudice to the defense in denying the continuance given their prior knowledge of the issues relating to Schaar and the prescription stamps. *See Walters*, 351 F.3d at 170. The district court did not abuse its discretion in denying the continuance. *See Squyres*, 782 F.3d at 237–38.

*F. Jury Instructions*

Diaz argues that the district court's decision to give deliberate ignorance and aiding and abetting jury instructions was erroneous. Both deliberate ignorance jury instructions and aiding and abetting jury instructions are reviewed for abuse of discretion. *See United States v. Ricard*, 922 F.3d 639, 654–55 (5th Cir. 2019) (reviewing deliberate ignorance for abuse of discretion); *United States v. Turner*, 674 F.3d 420, 442 (5th Cir. 2012) (reviewing aiding and abetting for abuse of discretion). In conducting our review, we "ask whether the court's charge, as a whole, is a correct statement of the law and whether it clearly instructs jurors as to the principles of the law applicable to the factual issues confronting them." *United States v. Martinez*, 921 F.3d 452, 477 (5th Cir. 2019) (citation omitted). "A jury instruction must: (1) correctly state the law, (2) clearly instruct the jurors, and (3) be factually supportable." *United States v. Fairley*, 880 F.3d 198, 208 (5th Cir. 2018). Specific jury instructions should be "considered in the context of the instructions as a whole and the trial record" and "not in isolation." *Id*.

No. 18-60455

A deliberate ignorance instruction "inform[s] the jury that it may consider evidence of the defendant's charade of ignorance as circumstantial proof of guilty knowledge." *Ricard*, 922 F.3d at 655. This instruction "guards against a defendant who 'choos[es] to remain ignorant so he can plead lack of positive knowledge in the event he should be caught.'" *Id.* (quoting *United States v. Lara-Velasquez*, 919 F.2d 946, 951 (5th Cir. 1990)). "[A] deliberate ignorance instruction 'should only be given when a defendant claims a lack of guilty knowledge and the proof at trial supports an inference of deliberate ignorance.'" *Id.* at 655–56 (citation omitted). An inference can be made that deliberate ignorance exists if there is evidence showing "(1) subjective awareness of a high probability of the existence of illegal conduct, and (2) purposeful contrivance to avoid learning of the illegal conduct." *Id.* at 656.

"Aiding and abetting is not a separate offense, but it is an alternative charge in every indictment, whether explicit or implicit," and a district court's decision to give an aiding and abetting instruction will not be reversed absent a showing of unfair surprise. *See Turner,* 674 F.3d at 442. "To be convicted under an aiding and abetting theory, the defendant must 'share[ ] in the principal's criminal intent' and take some affirmative steps 'to aid the venture or assist[ ] the perpetrator of the crime.'" *Id.* (citation omitted). Further, he "must have aided and abetted each material element of the alleged offense[s]." *Id.*

Given Diaz's statements to Schaar on the recordings (specifically the 2017 recording) that he would pretend to know nothing of the scheme and advising Schaar to do the same to keep himself "out of trouble," the deliberate ignorance instruction was appropriate. Additionally, although Diaz claims that he believed the prescriptions were "medically necessary" this does not comport with his failure to examine the Tricare beneficiaries until he received notice of

15

the audit—especially given his decades of experience as a physician. The district court did not abuse its discretion in issuing the instruction. *See Ricard*, 922 F.3d at 654–55. Likewise, the aiding and abetting instruction was also proper. "Aiding and abetting is not a separate offense, but it is an alternative charge in every indictment, whether explicit or implicit." *See Turner,* 674 F.3d at 442. The district court instructed the jury consistently with the indictment, which charged the specific offenses and aiding and abetting in the alternative under 18 U.S.C. § 2.

*G. Restitution*

Diaz does not dispute that the district court ordered an amount of restitution equal to the total loss sustained by the Tricare, CVS Caremark, Express Scripts, and Optum Rx. Instead, he complains that the district court never considered his financial resources or his earning capacity in determining his ability to pay the ordered restitution. The government counters that Diaz's appeal of the restitution order should be dismissed under *Manrique* because he failed to timely file an appeal of the district court's amended judgment ordering restitution. *See Manrique v. United States*, 137 S. Ct. 1266, 1271 (2017).

"We review the quantum of an award of restitution for abuse of discretion." *United States v. Sharma*, 703 F.3d 318, 322 (5th Cir. 2012). This court may affirm "if the record provides an adequate basis to support the restitution order." *Id*. The Mandatory Victim Restitution Act ("MVRA") authorizes restitution to a victim "directly and proximately harmed" by a defendant's offense of conviction. *See Sharma*, 703 F.3d at 322 (quoting 18 U.S.C. § 3663A). Restitution awarded under the MVRA "is to compensate victims for losses, not to punish defendants for ill-gotten gains." *Id*. "An award of restitution greater than a victim's actual loss exceeds the MVRA's statutory maximum." *Id*.

No. 18-60455

The district court sentenced Diaz to concurrent terms of 42 months of imprisonment followed by a three-year term of supervised release but deferred imposing restitution to a later date because Diaz had failed to provide the financial information needed for the court to make the calculation. Diaz noticed his appeal with this court on June 20, 2018. In denying Diaz's motion for release pending appeal, the district court expressed its exasperation, noting that Diaz and his counsel failed to provide sufficient information to enable the court to make a restitution finding and that Diaz had professed ignorance even when faced with such basic questions as whether he had any bank accounts at all. On October 16, 2018, four months after Diaz had lodged his appeal with this court, the district court, upon receiving the required financial information from Diaz, amended its judgment to include restitution in the amount of $3,374,409.16, pursuant to the MVRA. *See* 18 U.S.C. § 3663A. The total restitution amount was comprised of four subtotals to four separate companies: (1) Tricare ($2,345,242.92); (2) CVS/Caremark ($599,686.49); (3) Express Scripts ($419,236.44); and (4) Optum RX ($10,243.31). Two months later in December of 2018, Diaz moved this court for release pending appeal which was denied on January 28, 2019. Diaz never filed a second notice of appeal after the district court amended its judgment to include restitution.

As the government argues, the Supreme Court has recently held that "[t]he requirement that a defendant file a timely notice of appeal from an amended judgment imposing restitution is at least a mandatory claim-processing rule." *See Manrique*, 137 S. Ct. at 1271 (citing *Greenlaw v. United States*, 554 U.S. 237, 252–253 (2008)). The Supreme Court explained in *Manrique* that "[u]nlike jurisdictional rules, mandatory claim-processing rules may be forfeited 'if the party asserting the rule waits too long to raise the point.'" *Id*. at 1272. If, however, properly raised "they are 'unalterable.'" *Id*. (noting that appellate court had a mandatory duty to dismiss appeal where the

government timely raised petitioner's failure to file a notice of appeal from the amended judgment imposing restitution).

Here, *Manrique* appears to mandate that this court dismiss Diaz's appeal of the district court's restitution order since he failed to notice an appeal from the district court's amended judgment imposing restitution. *Id.* at 1272. Even if *Manrique* did not require dismissal of Diaz's restitution claim on appeal, the district court's restitution order is clearly supported by the 27-volume record in this case. *See United States v. Mathew*, 916 F.3d 510, 516 (5th Cir. 2019) ("The district court must support 'every dollar' of a restitution order with record evidence.") (citation omitted). A review of the record reveals that the dollar amounts listed by the district court comport with, and do not exceed, the actual losses of the four named pharmacies, therefore, the amounts are compliant with the MVRA's statutory requirements. *See Sharma*, 703 F.3d at 322. In other words, "the record provides an adequate basis to support the restitution order." *Id.*

## III. Conclusion

For the foregoing reasons, we affirm Diaz's convictions, the district court's denial of Diaz's motion for a new trial, and the district court's amended judgment and restitution order.