# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

October 27, 2020

Lyle W. Cayce
Clerk

No. 19-40659

United States of America,

*Plaintiff—Appellee*,

*versus*

Arturo Javier Garcia-Perez,

*Defendant—Appellant*.

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 2:19-CR-123-1

Before Jones, Haynes, and Ho, *Circuit Judges*.

Per Curiam:*

Arturo Garcia-Perez argues that his convictions for transporting an illegal alien within the United States and conspiring to do the same should be reversed for two reasons. First, he claims that the verdicts rest on insufficient evidence. Second, he claims that his right to due process was violated under *Doyle v. Ohio*, 426 U.S. 610, 618 (1976)—that there was a "fundamentally

---

* Pursuant to 5th Circuit Rule 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th Circuit Rule 47.5.4.

unfair" use of his "silence" notwithstanding the *Miranda* warning's "express assurance" that silence "will carry no penalty." For the reasons below, we affirm.

## I.

## A.

In January 2019 Luis Romero-Mendez was asked if he could pick up "an illegal" in McAllen, Texas. Once Luis was told that the alien's family would pay, Luis and his cousin Regulo made their way over to the home of Garcia-Perez. Luis asked Garcia-Perez if he wanted to get paid to go pick up "an illegal." When Luis said he wasn't sure how much they'd be paid, Garcia-Perez responded, "Okay. That's fine." Garcia-Perez then drove Luis and Regulo from Houston to McAllen in his Chevy Silverado—a distance of about 350 miles.

Once in McAllen, the trio pulled into a gas station, where an alien— Eduin Garcia-Padilla—was waiting. Luis confirmed that Eduin was the designated pickup, Eduin got in the truck, and the four started back for Houston.

When they reached a checkpoint, Luis told Garcia-Perez to stop. Luis, Regulo, and Eduin then jumped out of the vehicle and spent the next 40 minutes moving through the brush to get around the checkpoint. It was 1:13 a.m. when Garcia-Perez drove through the checkpoint alone. Luis, Regulo, and Eduin rejoined Garcia-Perez in his truck once they had made it around.

Around 3:30 a.m., the four passed a police officer on the highway outside Robstown, Texas. In part because Garcia-Perez had quickly slowed the truck to around 55 mph (the speed limit was 75 mph), the officer stopped the party for two traffic violations. Garcia-Perez provided the officer his

driver's license, but simply looked to Luis when the officer asked where Garcia-Perez was coming from and where he was going. The officer then asked the passengers for identification. Realizing that Eduin had only "papers from Honduras" and noticing some muddy shoes beneath the front seats, the officer began to suspect that Eduin was "possibly here illegally."

Garcia-Perez initially claimed that Eduin was a stranger he had picked up at a fast-food restaurant in a nearby town. But the police officer knew that there were no such restaurants in that town. Garcia-Perez then claimed that Eduin was a cousin of his that they had come down from Houston to pick up—but he did not know his cousin's name. Garcia-Perez further insisted that he was not being paid to transport Eduin. The police officer eventually called Border Patrol because he felt that he was dealing with "four people with four different stories."

The border patrol officer interviewed the four men and arrested Garcia-Perez for alien smuggling. He then took the group to the border patrol station, where they were each read their rights. Garcia-Perez signed a form indicating that he understood his rights but also said that he was willing to make statements and answer questions. After reaffirming the wavier that he had signed, Garcia-Perez told a second border patrol officer that he was from Houston, that he was coming from McAllen, and that he, Luis, and Regulo had come to pick up Eduin. Garcia-Perez also confirmed that his companions had walked around the checkpoint while he drove through alone. Garcia-Perez then began recording a video statement. However, he soon said that he "[did]n't want to talk anymore" and the officer ended the interview.

Garcia-Perez was subsequently indicted on one count of conspiracy to transport an illegal alien within the United States and one count of transporting an illegal alien within the United States. He pleaded not guilty and proceeded to trial.

**B.**

At trial the government sought to introduce the videotaped statement. Defense counsel objected, arguing that the video "would be cumulative and . . . prejudicial in the sense that it's attracting attention towards [Garcia-Perez's] right to remain silent." Counsel suggested that playing the video "would be the same thing as having [Garcia-Perez] take the stand . . . in front of the jury[,] say[], 'I invoke my right to remain silent,' and then step[] down." The government countered that the video showed Garcia-Perez being Mirandized and that including Garcia-Perez's last statement was necessary for the jury to understand why the interview had ended. Defense counsel then clarified that he was *not* objecting to the border patrol officer testifying about the interview or Garcia-Perez's invocation of his right to remain silent, but rather "to the video being played for the jury." The district court overruled the objection and preadmitted the video exhibit.

During his opening statement, the prosecutor briefly mentioned that Garcia-Perez was "given the opportunity to make a video statement. He did so and under questioning he eventually asked that he no longer answer any questions. You'll get to see that video by the way."

Defense counsel did not object to the prosecutor's statement. During a recess, however, counsel again objected to the upcoming video presentation—this time expressly arguing that the video would be "some implicit comment on [Garcia-Perez's] invoking his right to remain silent." Defense counsel also presented *Doyle* case law. After some discussion, the government withdrew the exhibit on its own motion. Defense counsel made no further objections.

At the close of the government's case, Garcia-Perez made two failed motions for acquittal but presented no evidence. The court then instructed the jury that it "must consider only the evidence presented during the trial"

and that lawyers' "questions, statements, . . . and arguments" are "not evidence." The court also told the jury it should not convict based solely on the "unsupported testimony of an alleged accomplice unless [it] believe[d] that testimony beyond a reasonable doubt" and that "[t]he fact that an accomplice has entered a plea of guilty to the offense charged is not evidence of the guilt of any other person."

During its deliberations, the jury requested "to see the statement from the Defendant taken at the . . . Border Patrol Station." The court said that it would tell the jury to "Please just consider the evidence that was presented," to which defense counsel responded: "That's fine, Your Honor, yes." The court then said, "Right?" and defense counsel confirmed his approval: "That's perfect."

The jury found Garcia-Perez guilty on both counts. Garcia-Perez appealed.

## II.

On appeal, Garcia-Perez argues that (A) the jury's verdicts were based on insufficient evidence and (B) that the actions of the district court and prosecutor amounted to a reversible-error *Doyle* violation.

## A.

Garcia-Perez preserved his insufficient-evidence challenges by moving for acquittal under rule 29 of the Federal Rules of Criminal Procedure. *United States v. Scott*, 892 F.3d 791, 796 (5th Cir. 2018). We review such preserved claims de novo. *Id.* In so doing, "we view all evidence, whether circumstantial or direct, in the light most favorable to the government, with all reasonable inferences and credibility choices to be made in support of the jury's verdict." *Id.* (quotations omitted). We will affirm a verdict if "*any* rational trier of fact could have found the essential elements

of the crime beyond a reasonable doubt." *Id.* at 797. "Our inquiry is limited to whether the jury's verdict was reasonable, not whether we believe it to be correct." *Id.* (quotations omitted).

Garcia-Perez claims that the circumstantial evidence was lacking and that the only direct evidence came from Luis, who "orchestrated the entire affair" and presented "incredible" testimony. Specifically, Garcia-Perez disputes that a jury could have found that (1) there was an agreement; (2) Garcia-Perez acted with knowledge or in reckless disregard of the fact that the alien's presence in the United States was illegal; or (3) Garcia-Perez acted in furtherance of the alien's unlawful presence.

We find that there is more than enough evidence to uphold the jury's verdicts. To summarize, the evidence showed that Garcia-Perez agreed to and in fact embarked on a 700-mile roundtrip drive in the middle of the night to pick up a total stranger in McAllen, Texas. Once Garcia-Perez and his passengers stopped at the border patrol checkpoint, the stranger exited the vehicle with Garcia-Perez's friends to spend over half an hour struggling through the brush on the side of the road. And when Garcia-Perez was stopped by the police officer, he initially failed to answer basic questions and then gave inconsistent and inaccurate explanations about his connection to the alien and what he was doing.

To be sure, much of this evidence was derived from the testimony of a cooperating, formerly convicted co-conspirator. But "[t]he jury retains the sole authority to . . . evaluate the credibility of witnesses." *Id.* (quotations omitted). In any event, "[a] conviction, especially one accompanied by an accomplice instruction, may be sustained on the uncorroborated testimony of an accomplice so long as the testimony is not incredible or otherwise insubstantial on its face." *Id.* (quotations omitted). And "[t]estimony is incredible as a matter of law only if it relates to facts that the witness could

not possibly have observed or to events which could not have occurred under the laws of nature." *Id.* Similarly, Luis's testimony was not rendered incredible by the fact that he had a "motive to testify against [Garcia-Perez] for the possibility of a reduced sentence" because the jury was "adequately informed" on this point. *United States v. Bowen*, 818 F.3d 179, 186 (5th Cir. 2016).

## B.

### 1.

While Garcia-Perez preserved his insufficient-evidence claims, Garcia-Perez did *not* preserve his *Doyle* objection to either the district court's decision to preadmit the video or the prosecutor's reference to Garcia-Perez's statement in the video.

In fact, on appeal Garcia-Perez at times challenges the district court's evidentiary ruling as an abuse of discretion, seemingly acknowledging that he initially opposed the video on rule 403 grounds—not *Doyle* grounds. In any event, it is undisputed that Garcia-Perez failed to object to (a) the prosecutor's opening statement;[1] (b) the jury instructions; and (c) the district court's response to the jury's request for the video statement. In fact, Garcia-Perez called the district court's actions on this last point "perfect." What's more, Garcia-Perez's brief combines his analysis of the district court's initial evidentiary ruling with his analysis of the prosecutor's

---

[1] We recognize that under rule 103(b) of the Federal Rules of Evidence, "[o]nce the court rules definitively on the record—either before or at trial—a party need not renew an objection or offer of proof to preserve a claim of error for appeal." But as noted above, Garcia-Perez did not make a specific *Doyle* objection until the recess. It is therefore significant that even once Garcia-Perez invoked *Doyle* and the court began to reconsider its earlier evidentiary ruling, Garcia-Perez did not raise any concerns about the prosecutor's opening statement.

comment, arguing that the actions together "released" "the proverbial skunk . . . into the jury box." Accordingly, we review the district court's initial evidentiary ruling and the prosecutor's comment as a single, unpreserved alleged *Doyle* violation.[2]

### 2.

Because Garcia-Perez's *Doyle* challenge is unpreserved, we review for plain error. *United States v. Andaverde-Tiñoco*, 741 F.3d 509, 518 (5th Cir. 2013). Thus, Garcia-Perez "must show: (1) error; (2) that is plain; (3) that affects substantial rights; and (4) that warrants discretionary review by this court because the harm so severely affects the fairness of the proceedings." *United States v. Broussard*, 882 F.3d 104, 111 (5th Cir. 2018).

We decline to conduct a full plain-error analysis because any alleged *Doyle* error in this case was far from "plain." After all, "to determine whether [a] prosecutor's comments violate[] *Doyle*, th[e] comments must be evaluated in context." *United States v. Wright*, 777 F.3d 769, 779 (5th Cir. 2015). Here, Garcia-Perez repeatedly waived his rights in order to answer law enforcement's questions. He agreed to make a video statement. It was only after the tape began rolling that he finally expressed a desire to stop questioning. The government naturally sought to present all the evidence it could to show both how often Garcia-Perez incriminated himself and how he reacted under questioning. So there is nothing obviously nefarious about the prosecutor noting, while previewing the government's evidence, that "under

---

[2] To the extent Garcia-Perez does raise a pure, preserved rule 403 challenge to the district court's evidentiary ruling, we agree with the government that no independent analysis on this point is necessary. Even assuming *arguendo* that the district court erred in preadmitting the video, the jury never saw the video because the government withdrew it. Thus, the only impact the court's ruling could have had on the proceedings was with respect to the prosecutor's reference to the video during his opening statement, which we review below.

questioning [Garcia-Perez] eventually asked that he no longer answer any questions." In context, the remark was arguably nothing more than a preemptive explanation about why the anticipated video recording ended when it did.

In short, we simply cannot say on the record before us that it is "clear or obvious" that the "manifest intent" of the prosecutor's remark was to "comment on the defendant's silence," or that the statement's character was such that "the jury would naturally and necessarily so construe the remark." *Andaverde-Tiñoco*, 741 F.3d at 518, 520.[3]

\* \* \*

For the foregoing reasons, we affirm Garcia-Perez's convictions.

---

[3] Careful readers will note that *Doyle* "rests on the fundamental unfairness of implicitly assuring a suspect that his silence will not be used against him and then using his silence *to impeach an explanation subsequently offered at trial*." *United States v. Fambro*, 526 F.3d 836, 841 (5th Cir. 2008) (emphasis added) (quotations omitted) (quoting *Wainwright v. Greenfield*, 474 U.S. 284, 291 (1986)). So one might wonder why *Doyle* is implicated at all in a case (like this one) where the defendant has not offered a subsequent explanation at trial. But our court has held that "the principles of *Doyle* apply even if a defendant does not take the stand in his own defense thereby subjecting himself to potential impeachment." *Id.* In short, "[a] defendant is entitled to rely on the assurance when he is '*Miranda*-ized' that his silence will not be used against him." *Id.*