# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 18-30791

United States Court of Appeals
Fifth Circuit

**FILED**
July 10, 2019

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff–Appellee,

v.

LAZANDY DANIELS,

Defendant–Appellant.

Appeal from the United States District Court
for the Eastern District of Louisiana

Before KING, SMITH, and WILLETT, Circuit Judges.

DON R. WILLETT, Circuit Judge:

A jury convicted Lazandy Daniels of distributing crack cocaine, aiding and abetting possession with intent to distribute crack cocaine, and conspiring to distribute powder and crack cocaine. Daniels asserts three errors: (1) the district court wrongly denied his motion to suppress evidence; (2) the district court wrongly denied him the opportunity to cross-examine an adverse witness in violation of the Sixth Amendment; and (3) the trial evidence was insufficient to convict him. We reject Daniels's arguments and AFFIRM his convictions.

I

A

This story starts with Craig James, a cocaine dealer who made his living transporting drugs and money between Houston and New Orleans. The

No. 18-30791

defendant, Daniels, met James through his brother, Lindsey Daniels. Lindsey was a middle man, purchasing cocaine from James and then turning around and reselling it. As part of their partnership, Lindsey let James use his New Orleans salvage yard for transporting drugs. James would buy cars at auction in one city, store cocaine in them, and transport the cars to the other city. He also used this strategy to move money.

The law eventually caught up with Lindsey. But James continued to use the salvage yard. Daniels started working more closely with James, helping him unload the cocaine from the cars and pack them with money before they returned to Houston. Sometimes Daniels was around when James distributed the drugs, and he would help James package the concomitant cash in cellophane. Daniels even dabbled in the drug game himself: James testified (and others confirmed) that he occasionally gave Daniels small amounts of cocaine to sell.

Besides helping James move cocaine, Daniels acted as James's chauffeur. When James was in New Orleans, Daniels would "[t]ake [James] to go get food, pick [him] up from the airport, take [him] to [his] hotel room, things like that." James said he asked Daniels to carry out these tasks because Daniels "was a friend . . . . It wasn't just all business. He was a friend. I trusted him."

*May 4, 2015 State Arrest*

In May 2015, Daniels was arrested for selling crack cocaine outside his house. While conducting surveillance as part of a street-level narcotics investigation, New Orleans police Sergeant Joseph Davis noticed a woman in a white SUV stop her car, step out, and approach Daniels, who was standing on the street. She handed something to Daniels, who went into his house. Daniels came back out dand handed her another object; then she got back into her car.

2

No. 18-30791

Suspicious, Davis followed the SUV and radioed his fellow officers to pull it over. While attempting to do so, Officer Jeraire Bridges saw the woman drop a small item from her window. Once the woman had pulled over, Bridges retrieved the dropped item. It appeared (and was later confirmed) to be a plastic bag of crack cocaine. The officers arrested the woman.

Later that day, New Orleans police officers arrested Daniels. The officers found him sitting in a pickup truck outside his house. The officers searched the truck and the house, finding $2,325 in cash in the vehicle, a video recording system monitoring the residence, and what turned out to be cocaine residue in a mug in the house. Daniels was charged in Orleans Parish Criminal District Court with possession with the intent to distribute cocaine.

*December 2, 2015 Drug Enforcement Agency Arrest*

These December incidents were initially unrelated to Daniels's May arrest—they arose out of the DEA's separate surveillance spearheaded by Agents Justin Moran and Christopher Johnson. Thanks to a confidential tip, the DEA learned that James was coming to New Orleans in early December to collect some money. Upon his arrival, James took a taxi to the Super 8 Motel on Chef Menteur Highway and rented a room.

James testified that on December 1, 2015, a friend paid him an evening visit, bringing James a duffle bag filled with various drug paraphernalia, including a scale and cowboy boots stuffed with a cutting agent. Daniels came by that evening and the next morning to "check on" James. Around noon, Daniels left to go to his brother's salvage yard. He returned around 12:34 p.m. Before entering the motel, he retrieved from his trunk a long, thin item that he kept under his jacket. The concealed item was a roll of cellophane for wrapping cash, but the surveilling DEA agents thought it might be a weapon.

Around 2:00 p.m., James's brother-in-law, Joppa Jackson (whom the DEA agents recognized from previous narcotics investigations), came to the

3

motel in his pickup truck. James left Daniels in the motel room and got into the pickup, which never left the parking lot. After a bit, James got out of the truck with a bag of money, repayment for cocaine James had given Joppa.

Eight minutes later, Daniels and James left the motel to dine at a restaurant for a couple hours. The pair returned to the motel room in the late afternoon. At around 6:40 p.m., Leon Jackson, James's other brother-in-law, arrived. When Leon exited the motel, DEA Agent Demond Lockhart approached him to perform an investigatory stop. Agent Lockhart searched Leon's bag and vehicle and hit the jackpot: several thousand dollars.

*The Knock-and-Talk*

After interviewing Leon Jackson, the DEA agents decided to do a "knock-and-talk," (when officers knock on a door, contact the resident, and ask to search the residence). As he approached the room, DEA Agent Michael Greaves could smell marijuana. Agent Greaves knocked on the door, and James asked who was there. Greaves initially pretended that he had hit James's car. James did not open the door. Greaves then announced that he was with the police and asked James to open the door so they could talk.

After knocking for two minutes, Greaves heard Moran, who was standing to his left by the motel-room's window, say that he could hear the toilet flushing. Greaves, inferring that James was destroying evidence, decided to kick down the door. DEA Agent Kevin Treigle searched the bathroom, finding Daniels seated on the toilet, fully clothed, with the seat cover down.

In the room, the officers found a long roll of cellophane, a plastic bag filled with cutting agent, a black duffle bag with lots of cash, much of which was wrapped in cellophane, a digital scale, and crack cocaine. They seized approximately $286,000 and approximately six ounces of crack cocaine.

No. 18-30791

B

Daniels was charged with one count of conspiracy to distribute 5 kilograms or more of powder cocaine and 28 grams or more of crack cocaine; one count of distributing crack cocaine on May 4, 2015; and one count of possessing with intent to distribute 28 grams or more of crack cocaine on December 2, 2015.

Daniels moved to suppress the motel-search evidence, arguing that no exigency supported the warrantless search. The district court conducted a suppression hearing. Several DEA agents testified regarding the knock-and-talk and resulting search. Pertinently, DEA Agent Francisco Del Valle testified that he had heard the toilet flush while Agent Greaves was knocking on the motel-room door. Daniels had the opportunity to cross-examine each of the Government's witnesses.

Daniels also attempted to subpoena Agent Moran to have him testify at the hearing. At the time, Moran was under investigation for misconduct, and he asserted his Fifth Amendment rights. Although the court did not require Moran to testify, it allowed Daniels's counsel to explain what he wanted to ask Moran.

The district court denied Daniels's motion to suppress, holding that he didn't have standing to challenge the motel-room search because there was no evidence indicating he intended to stay overnight. And even if Daniels had standing, the Fourth Amendment's exigency exception permitted the search. The flushing sounds gave the officers "probable cause to believe that there was evidence of criminal activity in the room, and that the evidence was being destroyed."

In preparation for trial, the Government filed a motion in limine to preclude Daniels from attacking the credibility of its witnesses based on Agent Moran's alleged misconduct. The Government asked the court to prohibit

No. 18-30791

Daniels from "[i]nflaming the [j]ury" by referencing the investigation during trial, arguing that it was irrelevant. The district court granted the motion, finding Moran's alleged misconduct "unrelated to the matter at hand."

The case went before a jury. The Government called twelve witnesses, among them Agents Greaves and Treigle (the New Orleans police officers involved in the May 4 arrest) and Daniels's alleged co-conspirators, Joppa Jackson and James. At the close of the Government's case in chief, Daniels moved for judgment of acquittal, which the court denied. Daniels submitted several exhibits to the jury, but he did not testify in his own defense or call any witnesses to testify. The jury found Daniels guilty of all three counts. The court sentenced Daniels to 240 months' imprisonment as to all three counts, to be served concurrently, and ten years of supervised release. Daniels appealed.[1]

## II

The district court had jurisdiction under 18 U.S.C. § 3231. And we have appellate jurisdiction under 28 U.S.C. § 1291.

## III

## A

First, Daniels challenges the district court's denial of his motion to suppress the evidence from the motel-room search. "When a district court denies a motion to suppress evidence, we review the factual findings for clear error and legal conclusions . . . *de novo*."[2] And we may affirm the decision below

---

[1] During the sentencing hearing, Daniels expressed his frustration with his lawyer. At the close of the hearing, Daniels's counsel made an oral motion to withdraw as counsel, which the court granted. Daniels then petitioned to vacate his sentence under 28 U.S.C. § 2255, arguing his counsel failed to follow his instructions to file an appeal. After an evidentiary hearing, the court ordered that Daniels be allowed to file an out-of-time appeal and dismissed his § 2255 motion as premature.

[2] *United States v. Beene*, 818 F.3d 157, 161 (5th Cir. 2016).

"on any basis established by the record."[3] The burden is on Daniels to prove, "by a preponderance of the evidence, that the evidence in question was obtained in violation of his Fourth Amendment rights."[4]

"The exclusionary rule allows a defendant to suppress the evidentiary fruits of a violation of his Fourth Amendment rights" to be free of unreasonable searches and seizures.[5] Although "searches and seizures inside a home without a warrant are presumptively unreasonable,"[6] an officer may search a person's property if "'the exigencies of the situation' make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable."[7] A valid exigency exists when an officer believes that evidence is being destroyed—although an officer "may not rely on the need to prevent destruction of evidence when that exigency was 'created' or 'manufactured' by the conduct of the police."[8] In other words, an officer may not "engag[e] or threaten[] to engage in conduct that violates the Fourth Amendment" in order to create an exigency justifying warrantless entry.[9]

Assuming without deciding the issue of standing, we will first address whether there was an exigency justifying the search.[10] To do so, we use a non-exhaustive five-factor test:

> (1) the degree of urgency involved and the amount of time necessary to obtain a warrant; (2) the reasonable belief that

---

[3] *United States v. Iraheta*, 764 F.3d 455, 460 (5th Cir. 2014) (quoting *United States v. Pack*, 612 F.3d 341, 347 (5th Cir. 2010)).

[4] *Id.* (quoting *United States v. Kelley*, 981 F.2d 1464, 1467 (5th Cir. 1993)).

[5] *Pack*, 612 F.3d at 347.

[6] *Kentucky v. King*, 563 U.S. 452, 459 (2011) (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)).

[7] *Id.* at 460 (alteration in original) (quoting *Mincey v. Arizona*, 437 U.S. 385, 394 (1978)).

[8] *Id.* at 461.

[9] *Id.* at 462.

[10] *See United States v. Flores*, 640 F.3d 638, 642 (5th Cir. 2011) ("[E]ven assuming [the Defendant] has standing to challenge the search, the good-faith exception to the exclusionary rule applies under these facts.").

contraband is about to be removed; (3) the possibility of danger to the police officers guarding the site of contraband while a search warrant is sought; (4) the information indicating that the possessors of the contraband are aware that the police are on their trail; and (5) the ready destructibility of the contraband and the knowledge that efforts to dispose of it and to escape are characteristics in which those trafficking in contraband generally engage.[11]

Daniels argues that a "single toilet flush" was not enough to justify entry. If a solitary flush were the only evidence of exigency in the record, he might be right. But the officers relied on more than just the flush. In fact, they were flush with exigency evidence. After he knocked, Agent Greaves could hear "running throughout the room, running back and forth like from the right side where the door was back to the left side by the window." He says there were times when James's "voice was real close to the door" and when he "could tell he was much further away from the door," indicating that James was running back and forth.[12] Agent Greaves had told James he was a police officer, so he was "aware that the police [were] on [his] trail."[13] And Agent Webber testified that it is "not uncommon for drug dealers to flush narcotics down the toilet." Combined with the toilet-flushing sounds, this all reasonably suggests that the room's occupants might have been attempting to destroy evidence. The *Aguirre* factors therefore suggest that exigent circumstances existed justifying the warrantless search. So, the district court did not err in finding there was an exigency to justify the warrantless search. The officers had a full house of evidence, and a full house beats a flush.[14]

---

[11] *United States v. Aguirre*, 664 F.3d 606, 611 (5th Cir. 2011) (quoting *United States v. Mata*, 517 F.3d 279, 287 (5th Cir. 2008)).

[12] *Id.*

[13] *Aguirre*, 664 F.3d at 611.

[14] *Poker Rules—How to Play Poker Games*, POKERNEWS.COM, https://www.pokernews.com/poker-rules/ (last visited July 8, 2019).

No. 18-30791

Now that we know an exigency existed, we must ask whether the officers *created* the exigency.[15] Daniels says the officers' aggressive conduct made him believe that he was trapped, in violation of the Fourth Amendment, thereby creating the exigency. But the officers acted within the bounds of our caselaw. In *King*, police "banged on the door as loud as [they] could," but that did not create the exigency.[16] Even though the defendant argued that the officers "demanded" entry, he couldn't back that up with any evidence in the record.[17] Likewise, Daniels does not point to any evidence in the record that the agents actually threatened his Fourth Amendment rights. While the officers here knocked vigorously, the knocking was relatively brief—around two minutes[18]—and the officers did not attempt to force entry prior to hearing the toilet flush.[19] The officers did not create the exigency.

Daniels fails to meet his burden of showing a Fourth Amendment violation. So the district court did not err in denying his motion to suppress.[20]

B

When a defendant makes a general sufficiency-of-the-evidence challenge, we review the sufficiency of the evidence supporting a conviction de novo.[21] But where the defendant asserts "*specific grounds* for a specific element of a specific count" in his motion for judgment of acquittal under Federal Rule of Criminal Procedure 29, the defendant fails to preserve any other grounds;[22]

---

[15] *See King*, 563 U.S. at 461.

[16] *See id.*

[17] *King*, 563 U.S. at 471 (alteration in original).

[18] *Cf., Westfall v. Luna*, 903 F.3d 534, 545 (describing officers' prolonged attempt to knock on door).

[19] *See United States v. Hernandez*, 392 F. App'x 350, 351–53 (5th Cir. 2010) (unpublished) (finding a Fourth Amendment violation where the officers attempted to force entry by trying to open a locked door and breaking the pane of a screen door with a baton).

[20] *Iraheta*, 764 F.3d at 460.

[21] *United States v. Brown*, 727 F.3d 329, 335 (5th Cir. 2013).

[22] *Id.* (quoting *United States v. Herrera*, 313 F.3d 882, 884 (5th Cir. 2002) (en banc) (per curiam)).

No. 18-30791

accordingly, we must ask whether there has been a "manifest miscarriage of justice."[23]

The parties disagree over which standard applies. At the close of the Government's case in chief, Daniels's counsel stated generally that he was making "an oral motion as to a directed verdict as to all counts on the superseding indictment as they refer to Mr. Lazandy Daniels."[24] And although he made specific points to support the motion, they were not specific to the elements of the crime. We thus review *de novo*. And "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."[25]

Count 1 convicted Daniels of conspiring to distribute 5 kilograms or more of powder cocaine and 28 grams or more of crack cocaine. Per Supreme Court directive, "[a] conviction for a drug conspiracy requires proof of '(1) an agreement between two or more persons to violate the narcotics laws, (2) the defendant's knowledge of the agreement, and (3) the defendant's voluntary participation in the conspiracy.'"[26] Here, the alleged "violat[ion of] the narcotics laws" is distributing cocaine, so, we must ask whether there was an agreement to "(1) knowingly (2) distribute[ ] (3) cocaine."[27]

Having reviewed the record, we hold that the evidence was more than sufficient for a rational trier of fact to convict Daniels. Although Daniels seeks

---

[23] *Id.* (quoting *United States v. McDowell*, 498 F.3d 308, 312 (5th Cir. 2007)).

[24] *See United States v. McCall*, 553 F.3d 821, 830 (5th Cir. 2008) ("Rule 29 motions need not be specific.").

[25] *United States v. Cooper*, 714 F.3d 873, 880 (5th Cir. 2013) (quoting *United States v. Uvalle–Patricio*, 478 F.3d 699, 701 (5th Cir. 2007)).

[26] *United States v. Scott*, 892 F.3d 791, 797 (5th Cir. 2018) (quoting *United States v. Booker*, 334 F.3d 406, 409 (5th Cir. 2003)).

[27] *United States v. Gordon*, 876 F.2d 1121, 1125 (5th Cir. 1989) (citing 21 U.S.C § 841(a)(1)).

to characterize himself as James's unwitting, overly helpful friend, the trial evidence was sufficient to prove that Daniels agreed to distribute both powder and crack cocaine; that he knew about the agreement; and that he participated voluntarily.[28] James and Joppa Jackson testified that Daniels helped them transport cocaine from Houston to New Orleans.[29] Sometimes Daniels would provide drugs to Joppa Jackson even when James wasn't around. James also testified that Daniels helped him wrap money in cellophane and load the cars with money "[a]ll the time." Both James and Joppa Jackson testified that they fronted crack cocaine to Daniels so that Daniels could sell it.

A rational trier of fact could easily find that Daniels was conspiring to distribute 5 kilograms or more of powder cocaine and 28 grams or more of crack cocaine beyond a reasonable doubt. There was sufficient evidence to convict Daniels of Count 1.

Count 2 accused Daniels of knowingly and intentionally distributing crack cocaine on May 4, 2015 (the white SUV episode). As with Count 1, there's ample evidence to show that Daniels "(1) knowingly (2) distributed (3) [crack] cocaine."[30]

The jury saw video footage of the transaction. Officers apprehended the woman shortly after and saw her throw a piece of crack cocaine out her car window. And when officers searched Daniels's house later, they found cocaine residue and $2,000 in cash. A rational trier of fact could easily find that Daniels knowingly and intentionally distributed crack cocaine. There was no error.

---

[28] *See Scott*, 892 F.3d at 797.

[29] Joppa testified that he would buy "between 10 and 20" kilograms of cocaine from James at a time, which he would pick up from Daniels at the salvage yard. James also testified that Daniels would help him unload anywhere from 4 to 12 kilograms of cocaine from the cars at a time.

[30] *Gordon*, 876 F.2d at 1125.

No. 18-30791

Count 3 accused Daniels of aiding and abetting the knowing and intentional possession of 28 grams or more of crack cocaine with intent to distribute on December 2, 2015 (the motel-room episode).[31] As we reiterated in *United States v. Cain*, "[t]he essential elements of possession with the intent to distribute controlled substances . . . are 1) knowledge, 2) possession, and 3) intent to distribute the controlled substances."[32] A conviction for aiding and abetting requires proof that "the substantive offense occurred and that the defendant (1) associated with the criminal venture; (2) purposefully participated in the crime; and (3) sought by his actions for it to succeed."[33] And as *Scott* clarified, a defendant who aids and abets the possession with intent to distribute a controlled substance "need not have actual or constructive possession of the drugs."[34]

Daniels's arguments focus on possession of the drugs. He says he didn't have any drugs on him when he was found in the motel bathroom and that his friend was the only person who actually brought crack cocaine to the motel room. But Count 3 was for aiding and abetting, so actual or constructive possession is irrelevant.[35]

The record clearly reflects Daniels's association with the criminal venture. As already mentioned, Daniels has a long history of assisting James with his drug smuggling business. He also closely associated himself with the criminal venture on the day in question by coming and going from the motel room and by dining with the other participants.

---

[31] We think it important to note that while the First Superseding Indictment charged Daniels with intentional possession, his ultimate conviction was for aiding and abetting.

[32] 440 F.3d 672, 675 (5th Cir. 2006) (quoting *United States v. Delgado*, 256 F.3d 264, 274 (5th Cir. 2001)).

[33] *Scott*, 892 F.3d at 798 (quoting *United States v. Pando Franco*, 503 F.3d 389, 394 (5th Cir. 2007)).

[34] *Id.* at 799 (quoting *United States v. Williams*, 985 F.2d 749, 753 (5th Cir. 1993)).

[35] *See Scott*, 892 F.3d at 799

No. 18-30791

The record is replete with evidence relevant to elements two and three: (2) purposeful participation and (3) seeking the crime's success. Daniels visited the hotel room where the crime took place multiple times in the days leading up to the arrest. Daniels provided the cellophane for cash wrapping. After the fateful toilet flush, DEA agents entered the room and found Daniels seated on the toilet, fully clothed, with the seat cover down. The hotel room contained $286,000 in cash and six ounces of crack cocaine.

Viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could easily conclude that Daniels was aiding and abetting.[36] There was sufficient evidence to convict Daniels of Count 3.

C

Next, Daniels says the district court abused its discretion when it granted the Government's motion in limine to stop him from discussing Agent Moran's alleged misconduct. After all, says Daniels, Moran played a vital role in his arrest, so information regarding his credibility is relevant, and the risk of prejudice to the Government is low. The Government flatly disagrees. We agree with the Government and cannot say the district court abused its discretion in granting the motion in limine.

We review evidentiary rulings for abuse of discretion.[37] We "will not vacate a conviction based on an error committed by the district court unless the error was harmful, affecting a substantial right of the complaining party," meaning that the "trier of fact would have found the defendant guilty beyond a reasonable doubt with the additional evidence inserted."[38]

---

[36] *See Cooper*, 714 F.3d at 880.

[37] *United States v. Willett*, 751 F.3d 335, 343 (5th Cir. 2014); *cf.* FED. R. EVID. 103(b) (moving party does not need to renew objection to court ruling on the record to preserve claim of error for appeal).

[38] *Willett*, 751 F.3d at 343 (quoting *United States v. Wen Chyu Liu*, 716 F.3d 159, 169 (5th Cir. 2013)).

13

Generally, relevant evidence is admissible.[39] Nevertheless, a court may exclude relevant evidence "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."[40]

Although Moran was under investigation, the district court didn't believe that fact was particularly probative. Nothing in the record indicates that Moran's investigation concerned anything in this case; rather, it was a "broad probe into law enforcement misconduct involving members of a DEA Task Force that included DEA Special Agents, officers from the Tangipahoa Parish Sheriff's Office, and officers from the Hammond Police Department." The Government's case didn't require Agent Moran's testimony. Allowing Daniels to present testimony on this point, however, would likely have unfairly prejudiced the Government's case. Plus, it could easily have confused the jury about whose guilt was at issue. Given all of this, we can't say the district court went so far afield as to abuse its discretion.

This too merits mention: Even if the district court *had* abused its discretion, the only error that resulted was harmless. Daniels hasn't explained what information about Moran's conduct he would have presented to the jury. On top of that, it's not clear that any such information would've been admissible.[41] After all, the Government argues, Moran never testified, so Federal Rules of Evidence 608 and 609 would probably render Daniels's hypothetical evidence inadmissible. Additionally, Federal Rule of Evidence 404(a)—prohibiting the admission of character evidence "to prove that on a

---

[39] FED. R. EVID. 402.

[40] FED. R. EVID. 403.

[41] Even though the Government pointed this out in its briefing, Daniels didn't respond or elaborate in his reply brief.

No. 18-30791

particular occasion [a] person acted in accordance with the character or trait"—would likely close the door on Daniels.

In sum, the district court didn't abuse its discretion. And even if it did, any resulting error was harmless.

D

Now we come to the final issue: Did the district court violate the Confrontation Clause? That is, did Agent Moran have to testify at the suppression hearing after he asserted his Fifth Amendment right against self-incrimination? Daniels says yes, because Moran played a significant role in the case, and his testimony was necessary. The Government responds that: (1) the district court couldn't have made Moran testify after he asserted his Fifth Amendment rights; (2) Moran didn't even testify, so Daniels didn't lose his ability to cross-examine him; and (3) Daniels said he would've asked Moran about his police report and search-warrant applications—but both of these were written after the search, so they're not relevant. Again, we side with the Government.

We review Confrontation Clause objections de novo, subject to harmless error review.[42] The Sixth Amendment guarantees a defendant the right "to be confronted with the witnesses against him."[43] This means a prosecutor can't rely on an "out-of-court testimonial statement unless the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness."[44] We've said before that, although the Sixth Amendment right to confront is a trial right, it also applies to suppression hearings.[45]

---

[42] *United States v. Acosta*, 475 F.3d 677, 680 (5th Cir. 2007).
[43] U.S. Const. amend. VI.
[44] *Acosta*, 475 F.3d at 680.
[45] *United States v. Stewart*, 93 F.3d 189, 192 n.1 (5th Cir. 1996).

The district court didn't err: The Sixth Amendment didn't require Moran to testify. Daniels doesn't cite any case that says the district court could have and should have compelled Moran to testify. And we can't find any such case either.[46]

Daniels argues that Moran was the only one who heard the toilet flush. If Moran were the only witness who could offer toilet testimony and the Government had presented hearsay evidence about it, then the district court might have violated Moran's right to confrontation. But the Government didn't even need to rely on hearsay to establish that the toilet flushed because Agent Del Valle also testified about it. Plus, Daniels had the opportunity to cross-examine Agent Del Valle.

At the very least, Daniels argues, Moran should have been forced to testify about his police report or his application for a search warrant. But (again) he doesn't point to any evidence that the Government broached these topics at the suppression hearing. And (again) the police report and warrant application both happened *after* the warrantless entry, so they weren't relevant to the suppression hearing. So even if the district did misstep, the error was harmless.

The Government's failure to put Moran on as a witness also didn't violate Daniels's Sixth Amendment right to compulsory process. The right to compulsory process is the defendant's own right to present evidence that "would have been relevant and material to the defense."[47] Daniels can't use the compulsory-process clause to compel the Government to call its own witnesses. And even if Daniels were arguing that he wanted to call Moran in his own

---

[46] The Government pointed out that Daniels can point to no authority to support his position, but Daniels still didn't cite any case law in his reply brief.

[47] *Washington v. Texas*, 388 U.S. 14, 23 (1967).

No. 18-30791

defense, we have held that "a witness'[s] right against self-incrimination will outweigh a defendant's right to force that witness to testify."[48]

For all these reasons, we find that the district court committed no harmful error by not requiring Moran to testify.

## IV

For the reasons explained above, we AFFIRM Daniels's convictions.

---

[48] *Brown v. Cain*, 104 F.3d 744, 749 (5th Cir. 1997).