# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

December 9, 2024

Lyle W. Cayce
Clerk

No. 23-10670

United States of America,

*Plaintiff—Appellee*,

*versus*

Sekhar Rao,

*Defendant—Appellant*.

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:19-CR-507-1

Before Smith, Clement, and Higginson, *Circuit Judges*.
Stephen A. Higginson, *Circuit Judge*:

This appeal arises from a scheme to defraud TRICARE, a federal health benefit plan. Following a jury trial, Sekhar Rao was acquitted of conspiracy to commit health care fraud but was convicted of two counts of substantive health care fraud based on two specific fraudulent claims. Rao raises three issues on appeal: (1) whether there was sufficient evidence to convict Rao on the substantive health care fraud counts; (2) whether the district court erred in excluding testimony regarding statements purportedly made to Rao by the scheme's leader that he had vetted the scheme with an attorney; and (3) whether the district court erred in calculating the loss amount

under the United States Sentencing Guidelines.  Finding no reversible error, we AFFIRM Rao's convictions and sentence.

## I

## A

Erik Bugen and others devised a health care fraud scheme to order medically unnecessary toxicology and DNA cancer screening tests and to bill those tests to TRICARE, a federal health benefit plan for active duty and retired servicemembers and their families.  As part of this scheme, Bugen started a shell company called ADAR Group, LLC ("ADAR Group") to set up fraudulent testing sites for collecting urine and saliva samples, which would then be submitted for unnecessary toxicology and DNA testing, respectively.  ADAR Group established a collection site in Killeen, Texas, near Fort Cavazos (then known as Fort Hood), to maximize reimbursements from TRICARE.  The site did not contain any medical exam rooms and was run by an office manager with no medical training or experience.  The facility would collect samples from as many as two hundred servicemembers and their spouses in a single day.  At the direction of the office manager, the "patients" filled out the patient portion of the testing requisition form; allowed the office manager to make copies of their military IDs, which listed their TRICARE numbers; and provided samples for testing.  The office manager filled out the billing, diagnosis, and testing portions of the requisition forms.  The "patients" then received a $50 Walmart gift card as payment.

But ADAR Group needed a doctor to order the testing for the costs to be reimbursed by TRICARE.  So, Bugen placed online job postings seeking remote contract physicians "to simply sign off on [ADAR Group's] Toxicology and DNA swabs for testing."  An example posting introduced at trial stated that ADAR Group "test[ed] [its] clients twice per week to insure [sic] they are staying sober" and that the physician would be "responsible for

reviewing the Tox Results and DNA results for each client." The posting listed the salary for the position as "$8,000.00/month." Bugen testified that he consistently sought to deceive doctors, including Rao, about the nature of the ADAR Group scheme, including lying to them that the ADAR Group clinics "were outpatient facilities for soldiers that were struggling with drug addiction or alcoholism" and hiding from them that the "patients"—who were not receiving any substance abuse treatment—were given Walmart gift cards in exchange for providing samples.

Rao responded to one of Bugen's job postings and negotiated a contract with Bugen under which Rao would be given the title "Physician Consultant" and would be paid "$50 per billable analyzed toxicology sample or DNA sample." Initially, Rao went to Bugen's house once or twice per week to sign the pre-filled requisition forms by hand. Bugen testified that Rao did not review any patient medical information before signing the requisition forms. Instead, Bugen and Rao together reviewed only the sample and insurance card associated with each requisition form, after which Rao would sign as the provider. Sometimes, Rao would sign one or two hundred forms in a single visit to Bugen's house. Bugen would submit the materials to the testing lab—primarily Cockerell Dermopathology—which then submitted the claims to TRICARE for reimbursement. According to Rao's own hand-written records of tests he ordered during these meetings with Bugen, he signed orders for 692 urinalysis tests and 98 DNA tests between June 6 and June 27, 2015, and for 732 urinalysis tests and 138 DNA tests between July 1 and August 16, 2015.[1]

_____

[1] Although financial records demonstrate that Rao worked for ADAR Group from May 2015 through January 2016, Rao's handwritten records only cover tests he ordered between June 6, 2015, and August 16, 2015.

No. 23-10670

As noted, the office manager had completed the diagnosis and testing codes on the requisition forms before Rao reviewed and signed them. The toxicology requisition forms almost always listed the same six diagnosis codes, which the forms indicated were "REQUIRED to indicate medical necessity," and ordered the same two "comprehensive panels" for the toxicology tests. According to expert trial testimony, these panels tested for multiple drugs that were no longer commonly used at the time the ADAR Group scheme was in operation.

Eventually, Bugen and his co-conspirators became concerned that Rao was making too much money because of the pay structure Rao had negotiated. To limit Rao's cut, Bugen decided to use a signature stamp, rather than having Rao continue signing by hand, so that Rao would not know the "full extent" of the number of requisition forms that ADAR Group was submitting on his behalf. Bugen testified that he ordered a rubber stamp of Rao's signature with Rao's knowledge and consent.[2] According to Bugen, Rao knew that the stamp was being used by ADAR Group employees to sign requisition forms on Rao's behalf, particularly given that Rao continued to receive payment for tests, even after he stopped personally signing the forms by hand. One of the office managers testified that Bugen told her to keep the stamp safe because Rao had been reluctant before ultimately agreeing to order the stamp. She also testified, however, that Rao never asked that his stamp be returned to him.

The two substantive counts in this case are based on two TRICARE claims, submitted on behalf of the same patient ("J.J."), both listing Rao as

_____

[2] Rao was not the only doctor working for ADAR Group to order tests that were then billed to TRICARE. Bugen also recruited and hired Rao's co-defendant Vinay Parameswara, among others. Like Rao, Parameswara agreed to let Bugen order a rubber signature stamp, which ADAR Group employees then used to sign the requisition forms.

the referring provider: (1) an October 13, 2015 submission for urinalysis toxicology testing based on a principal diagnosis of alcohol abuse, uncomplicated, billed to TRICARE for $2,584; and (2) an October 14, 2015 submission for cancer-related DNA testing based on a principal diagnosis of malignant neoplasm of the prostate, billed to TRICARE for $31,626. J.J. was a repeat "patient." All told, the Cockerell lab submitted claims to TRICARE for J.J. for thirty different care dates between June and November 2015, and Rao was J.J.'s referring provider for all but two of those care dates. Rao's own handwritten records corroborated the early dates, memorializing that Rao ordered urinalysis for J.J. on six occasions between June 20 and July 24. Despite the diagnoses listed in the requisition forms, J.J. testified that he was neither abusing alcohol nor suffering from cancer. And despite Rao's role as the referring provider, J.J. testified that he never met or spoke with Rao.

Ultimately, the Cockerell lab billed $36,173,586 to TRICARE between March 2, 2015, and March 18, 2016, and received $5,389,895 in reimbursements for all of the claims in this period. In all, about thirty-five percent of the claims submitted to TRICARE listed Rao as the provider, totaling approximately $13 million in costs billed to TRICARE. Between May 2015 and January 2016, Rao was paid approximately $55,000 through the ADAR Group scheme, all for tests that he submitted without meeting any patients, reviewing any of their medical history, or discussing the results.

Eventually, the ADAR scheme came to light, and Rao agreed to meet with a special agent from the Department of Defense ("DoD"). The DoD agent testified that, when Rao was asked about his employment by ADAR Group, Rao described his position as "medical director" and explained that his role was to evaluate patients recovering from drug and alcohol abuse, to order lab tests in connection with that work, and to develop a testing protocol with the goal of avoiding fraud. The DoD agent also testified that Rao indicated that he had initially signed the requisition forms from home, but that

No. 23-10670

ADAR Group eventually purchased a stamp with his signature. According to the DoD agent, Rao did not mention treating any patients or discussing their test results.

B

On September 25, 2019, a federal grand jury returned an indictment charging Rao and Parameswara with conspiracy to commit health care fraud in violation of 18 U.S.C. § 1349 (Count 1) and charging Rao alone with two counts of health care fraud, and aiding and abetting the same, in violation of 18 U.S.C. §§ 1347 and 2 (Counts 2 and 3), in connection with the claims submitted to TRICARE for J.J.'s October 13 and 14 tests.[3]

Rao pleaded not guilty to all three counts and exercised his right to a jury trial. The jury acquitted Rao on Count 1 (conspiracy to commit health care fraud) but found him guilty of the two counts of health care fraud in connection with J.J.'s October 13 and 14 tests (Counts 2 and 3). In advance of sentencing, Rao objected to numerous aspects of the Presentence Investigation Report ("PSR") prepared by the Probation Office, including the PSR's loss calculation. The district court overruled Rao's loss objection but ultimately varied downward from the 108-to-135-month range, sentencing Rao to 48 months of imprisonment, followed by three years of supervised release. Rao timely appealed, and we have jurisdiction over this appeal under 18 U.S.C. § 3742 and 28 U.S.C. § 1291.

II

Rao's challenge to the sufficiency of the evidence to convict him on Counts 2 and 3 is limited to two narrow issues: whether the government

---

[3] Parameswara was similarly charged with two individual health care fraud counts related to two specific claim submissions (Counts 4 and 5).

presented sufficient evidence for the jury to conclude (1) that "Rao's signature or stamp caused the submission of the October 13 and 14 claims to TRI-CARE," and (2) that "Rao authorized or knew of the use of his stamp to order lab work."[4]

A

This court "review[s] preserved challenges to the sufficiency of the evidence de novo, but [is] highly deferential to the verdict." *United States v. Scott*, 892 F.3d 791, 796 (5th Cir. 2018) (internal quotation marks and citation omitted). "[I]t is not the reviewing court's role to 'ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt,' but to ask, instead, 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Terry v. Hooper*, 85 F.4th 750, 754 (5th Cir. 2023) (quoting *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979)), *cert. denied*, 144 S. Ct. 1074 (2024).

However, "where the defendant asserts specific grounds for a specific element of a specific count in his motion for judgment of acquittal . . . , the defendant fails to preserve any other grounds." *United States v. Daniels*, 930 F.3d 393, 402 (5th Cir. 2019) (cleaned up). In such circumstances, where a particular sufficiency argument is not preserved, the court instead analyzes

---

[4] The government briefly raises one additional issue: whether Rao has waived any challenge to the district court's determination that there was sufficient evidence for the jury to convict Rao on Counts 2 and 3 under an aiding and abetting theory. But, as both parties highlight, the issue of whether there was sufficient evidence for a reasonable jury to convict Rao under an aiding and abetting theory relies on the same sufficiency issues. We therefore decline to decide whether Rao waived his aiding and abetting challenge, particularly given the parties' sparse briefing on this topic. As discussed below, there was sufficient evidence for a reasonable jury to conclude that Rao signed, or authorized the stamping of his signature on, the October 13 and 14 requisition forms.

only "whether there has been a manifest miscarriage of justice." *Id.* (internal quotation marks and citation omitted). Under that standard, the court "assess[es] whether 'the record is devoid of evidence pointing to guilt,' or 'the evidence on a key element of the offense is so tenuous that a conviction would be shocking.'" *United States v. Brown*, 727 F.3d 329, 335 (5th Cir. 2013) (quoting *United States v. McDowell*, 498 F.3d 308, 312 (5th Cir.2007)). As in de novo review, the court must "consider the evidence in the light most favorable to the government, giving the government the benefit of all reasonable inferences and credibility choices." *Id.* (quoting *McDowell*, 498 F.3d at 312).

## B

### 1

Rao preserved his first sufficiency argument by raising it in a timely motion for a judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure. *See* Fed. R. Crim. P. 29(c)(1); *United States v. Allison*, 616 F.2d 779, 784 (5th Cir. 1980) (per curiam).

To prove that a defendant is guilty of health care fraud under 18 U.S.C. § 1347, the government must prove beyond a reasonable doubt that the defendant "knowingly and willfully execute[d], or attempt[ed] to execute, a scheme or artifice—(1) to defraud any health care benefit program; or (2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program." 18 U.S.C. § 1347(a). The government "may use either direct or circumstantial evidence to prove each element." *United States v. Umawa Oke Imo*, 739 F.3d 226, 235 (5th Cir. 2014). Finally, although § 1347 does not punish "simply acts in furtherance of the scheme," *United States v. Hickman*, 331 F.3d 439, 446 (5th Cir. 2003), a defendant "may be convicted of aiding and abetting a substantive criminal

offense when he associates with the criminal activity, participates in it, and acts to help it succeed," *United States v. Turner*, 620 F. App'x 249, 254 (5th Cir. 2015) (quoting *United States v. Delagarza–Villarreal*, 141 F.3d 133, 140 (5th Cir. 1997)).

As to both Count 2 and Count 3, the district court instructed the jury that, to find Rao guilty of health care fraud under 18 U.S.C. § 1347 on each of these counts, the jury had to "be convinced that the Government has proved each of the following beyond a reasonable doubt" that: (1) Rao "submitt[ed] or caus[ed] the submission of false and fraudulent claims to TRICARE for tests that were among other things, not legitimately prescribed, not needed, not used, and induced through the payment of kickbacks and bribes"; (2) Rao "acted with a specific intent to defraud a health care benefit program"; (3) "the false or fraudulent pretenses, representations, or promises, that [] Rao used were material"; and (4) "the operation of the healthcare benefit program affected interstate commerce." Rao only challenges the sufficiency of the evidence as to the first element articulated by the district court.[5]

Although Rao highlights that the Cockerell lab, not Rao, submitted the fraudulent claims to TRICARE for reimbursement, this alone does not undermine the sufficiency of the evidence because "a defendant need not have actually submitted the fraudulent documentation in order to be guilty of health care fraud," *United States v. Willett*, 751 F.3d 335, 340 (5th Cir. 2014) (cleaned up) (quoting *Imo*, 739 F.3d at 235). Rao's primary contention is that the government presented insufficient evidence for a reasonable jury to conclude that Rao specifically *caused* the submission of the October 13 and 14

---

[5] It is undisputed, and was undisputed at trial, that all the claims for which Rao was listed as the referring provider, including the October 13 and 14 tests at issue in Counts 2 and 3, were medically unnecessary and that Rao should have met with the purported "patients" but failed to do so.

tests for the patient known as J.J., primarily because the government failed to present the signed requisition forms for those specific tests. To be sure, it would have been tidier for the government to have introduced those requisition forms into evidence. However, the government "may use either direct or circumstantial evidence to prove each element" of health care fraud, *Imo*, 739 F.3d at 235, and the government presented substantial circumstantial evidence here.

Importantly, although the government did not introduce the requisition forms sent to the Cockerell lab for the tests at issue, it did introduce TRICARE claims data maintained by Cockerell that listed Rao as the referring provider for both the October 13 test and the October 14 test. The data for J.J.'s October 13 test lists the principal diagnosis as alcohol abuse, uncomplicated, and indicates that TRICARE was billed $2,584 for the testing panel and that TRICARE ultimately paid $576. The data for J.J.'s October 14 test lists the principal diagnosis as malignant neoplasm of the prostate and indicates that TRICARE was billed $31,626 for the testing panel and that TRICARE ultimately paid $11,895.

The government sought to corroborate the accuracy of the lab's records by presenting evidence of multiple other claims—including claims for six of J.J.'s tests—for which the TRICARE claims data that the Cockerell lab maintained matched Rao's own handwritten records. Rao's notes indicated that he ordered urinalysis toxicology tests for J.J. dated June 30, July 2, July 14, July 17, July 21, and July 24, 2015. The government also introduced the corresponding TRICARE claims data, indicating that, for each of those dates, the Cockerell lab submitted claims for toxicology tests for J.J. listing Rao as the referring provider, using his National Provider Identifier ("NPI") number. Other such examples of claims appearing consistently in both Rao's handwritten records and the lab's TRICARE claims data include urinalysis toxicology tests that Rao's notes indicate he ordered for: D.G. on July 7,

2015; R.B. on July 15, 2015; and K.K. on July 24, 2015. One of the government's witnesses, a health care fraud investigator at DoD, testified about the TRICARE claims data, including explaining how the Cockerell lab's data matched up with Rao's handwritten notes, as detailed above.

Additional pieces of evidence introduced by the government that lend support to the conclusion that Rao caused the submission of the October 13 and 14 tests for J.J. include: TRICARE claims data maintained by the lab listing Rao as the referring provider on twenty-eight of the thirty care dates for which the lab submitted claims to TRICARE for testing J.J.'s samples; Rao's contract, setting forth the compensation Rao would receive for ordering toxicology and DNA tests; and financial records indicating that ADAR Group paid Rao during the relevant period, including payments on October 19 and November 16, 2015. These pieces of evidence support the inferences that Rao was J.J.'s usual referring provider, that toxicology and DNA tests were normal tests for Rao to order, and that Rao was ordering tests for ADAR Group "patients" at the time the October 13 and 14 tests were ordered for J.J.

Rao validly points to other evidence adduced at trial that could support the conclusion that the TRICARE claims data maintained by the Cockerell lab is unreliable: (1) the government explained in its opening statement that the owner of the Cockerell lab allowed the scheme's orchestrators to "set up shop downstairs"; (2) a DoD investigator testified that the NPI numbers are public; (3) the Cockerell data shows a different doctor than Rao for two of J.J.'s thirty care dates; and (4) one of the office managers testified that she only used Parameswara's stamp for cancer screenings. But there is countervailing evidence as well. For example, the evidence described at length above supports the conclusion that Rao's role was integral to the ADAR Group scheme, meaning that, even though Rao's NPI number was publicly available, it is unlikely that his number was misappropriated by just "anyone with an internet connection," as Rao suggests. Moreover, Rao does not

dispute that he caused the submission of hundreds of claims to TRICARE through the Cockerell lab. And although the lab was involved in the fraudulent activity, the available evidence described above suggests that Cockerell's data accurately recorded that fraudulent activity. As to the other doctors, the Cockerell data shows that Rao ordered J.J.'s tests on twenty-eight of the thirty care dates, and both Rao's contract and his handwritten records indicate that he ordered DNA screenings, as well as toxicology tests.

Although the jury could have weighed the evidence differently, there was nonetheless sufficient evidence for a reasonable jury to conclude that the TRICARE claims data maintained by the lab was reliable. *See United States v. Barnes*, 803 F.3d 209, 217 (5th Cir. 2015) ("[T]he jury holds the ultimate responsibility for evaluating the reliability of the evidence."); *United States v. Delgado*, 668 F.3d 219, 225 (5th Cir. 2012) ("The jury is free to choose among reasonable constructions of the evidence and the evidence need not exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt." (citation omitted)). The district court properly instructed the jury that the law does not distinguish between direct and circumstantial evidence and that the jury may make reasonable inferences from facts established by the evidence adduced at trial. Viewed together, in the light most favorable to the government, this body of evidence is sufficient for a reasonable jury to conclude that Rao caused the submission of the October 13 and 14 tests at issue in Counts 2 and 3, despite the government's failure to introduce the requisition forms for those care dates. Therefore, the district court did not err in denying Rao's motion for judgment of acquittal on this basis.

2

Turning to Rao's second sufficiency argument, the parties agree that Rao raises this specific argument for the first time on appeal. But while the

government contends that this argument is therefore not preserved, Rao asserts that his initial, oral motion for judgment of acquittal generally captured this challenge and that his more specific written motion should not be viewed as amending his earlier general motion. Neither Rao nor the government proffers any factually analogous case law to support their respective positions, but we need not resolve the issue here. Rao's second sufficiency argument fails even under the more rigorous de novo standard for preserved challenges. Viewing the evidence, both direct and circumstantial, in the light most favorable to the government, we conclude there was sufficient evidence for a reasonable jury to conclude that Rao authorized and knew about the use of his signature stamp to order lab work.

Evidence supporting this conclusion includes testimony from Bugen, signed requisition forms, the signature stamp, and the records of payments made to Rao. Bugen testified about both the acquisition and the use of the signature stamp. According to Bugen, Rao knew about and agreed to the purchase of a stamp with his signature that other ADAR Group employees could use to sign forms on his behalf. It is true, as Rao highlights, that Bugen also testified that the purpose of acquiring the stamp was to reduce the amount of money that Rao was making, as stamping by the office managers (rather than hand-signing by Rao) would allow ADAR Group to hide from Rao the "full extent" of the requisition forms being submitted on his behalf. But that testimony does not require the inference that Rao was unaware that the stamp was being used to order testing. Bugen also testified that Rao continued to receive payment for tests, even after he stopped personally signing the forms by hand, from which the jury reasonably could infer that Rao knew that ADAR Group employees were using the signature stamp to order tests in his name. Further, one of the office managers testified that Rao's signature stamp was kept at the Killeen facility, and another office manager testified

that Rao never requested the return of his stamp, allowing the jury to conclude that Rao continued to authorize this use of his signature stamp.

Additionally, the jury was shown numerous documents with Rao's handwriting, including requisition forms, some of which were signed by hand by Rao and others that were stamped with his signature. The signature stamp itself was also introduced and shown to the jury. Together, these pieces of evidence were sufficient to allow the jury to conclude that the stamp matched Rao's handwritten signature and that it was the stamp used to sign the stamped requisition forms on Rao's behalf.

The government introduced payment records corroborating Bugen's testimony that ADAR Group continued to pay Rao, even after he stopped signing the forms by hand. Bugen also testified that Rao continued to have access to the patient portal during this period, allowing him to view the results for tests ordered on his behalf. Rao highlights Bugen's testimony that Rao complained at one point that he lacked access to the portal. But Bugen testified that, after Rao complained, Bugen gave Rao the login information once again. If anything, this supports the inference that Rao paid explicit attention to the portal and therefore would have been aware of test results uploaded thereto. According to Bugen, it was "common sense" that Rao was aware how the stamp was being used in light of his continued payment and his continued access to test results.

Taken together, this evidence provided a sufficient basis for a reasonable jury to find that Rao knew of and authorized the use of his signature stamp to order tests.

## III

Rao next challenges his conviction on the basis that the district court "plainly erred in excluding evidence that Bugen assured Dr. Rao that the scheme had been approved by an attorney," which Rao now believes to have

been "one of many lies Bugen told to lure him into accepting the position at ADAR." The district court considered this issue during two pretrial conferences, as well as in a written order resolving various pretrial motions. In each instance, the district court conveyed that it expected to bar this line of questioning, but that Rao could raise the issue again at trial, if he believed that a sufficient factual basis had been developed.

## A

The government asserts that Rao has waived his evidentiary challenge because he failed to obtain a "definitive ruling" on the issue from the district court.[6] But the parties' waiver arguments are underdeveloped, largely relying on out-of-date and out-of-circuit case law. Moreover, the parties agree that, at best, this challenge is subject only to plain error review because Rao made no attempt to offer this evidence at trial. Because we ultimately conclude Rao has failed to demonstrate that the district court plainly erred in excluding this evidence, we need not decide the waiver issue.

On plain error review, Rao must show a "clear or obvious" legal error that "affected [his] substantial rights" and that "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *Puckett v. United States*, 556 U.S. 129, 135 (2009) (alteration in original).

## B

Rao acknowledges that the district court did not plainly err in holding that a traditional advice-of-counsel defense was not supported, given that

---

[6] Federal Rule of Evidence 103(b) provides that "[o]nce the court rules definitively on the record—either before or at trial—a party need not renew an objection or offer of proof to preserve a claim of error for appeal." However, a district court's ruling may still be "definitive" even if the court simultaneously encourages the defendant to raise the issue again at trial, if appropriate. *See, e.g.*, *United States v. Lucas*, 849 F.3d 638, 642 (5th Cir. 2017).

Rao never spoke with an attorney. But Rao asserts that he sought to make a different "variant of a good-faith defense," premised on Bugen's purported statements to Rao that Bugen had vetted the scheme with an attorney, and that the district court erred in precluding this line of questioning.

Rao's argument rests on a single district court opinion, *United States v. Hagen*, 542 F. Supp. 3d 515 (N.D. Tex. 2021), which Rao asserts recognized "a good-faith defense premised on legal advice received by another person and passed along to the defendant—i.e., derivative advice of counsel." As Rao notes, a district court opinion is not binding on another judge of the same court, much less on this court. Regardless, the court in *Hagen* considered an issue different from the one faced by the district court here: whether the defendants should be barred from calling as witnesses the former attorneys of a non-defendant co-conspirator, in light of the court's earlier order requiring the defendants to provide pre-trial notice of any intent to assert an advice-of counsel defense. *Id.* at 517. The court in *Hagen* explained that it "was not contemplating derivative advice of counsel" when issuing the earlier order and therefore concluded that the testimony should not be barred based on the defendants' failure to make an advice-of-counsel disclosure. *Id.* at 520. In so holding, the court in *Hagen* underscored that the question of "whether a good-faith defense premised on legal advice received by a non-defendant co-conspirator, and relayed to the criminal defendant, constitutes an advice-of-counsel defense" was a "novel" one that "has not been addressed before." *Id.* at 517.

The mere fact that the district court in the present case may have come to a conclusion different from the one reached by the court in *Hagen* about the viability of a novel "derivative advice-of-counsel" defense does not support a finding of plain error. *See United States v. Palmer*, 456 F.3d 484, 491 (5th Cir. 2006) ("A 'plain' error is one which is clear under current law."); *United States v. Garcia-Rodriguez*, 415 F.3d 452, 455 (5th Cir. 2005)

("[I]f a defendant's theory requires the extension of precedent, any potential error could not have been 'plain.'" (internal quotation marks and citation omitted)). Although this court has held that binding "[p]recedent . . . is not necessarily required to establish plain error," that holding applies only where the error was "obvious" in light of existing law. *United States v. Rodriguez-Flores*, 25 F.4th 385, 390 (5th Cir. 2022) (finding plain error, despite the lack of precedent from the Supreme Court of Texas on an issue of Texas state law, where a substantial number of Texas intermediate appellate courts had considered the issue and arrived at a unanimous conclusion); *see also, e.g.*, *United States v. Guillen-Cruz*, 853 F.3d 768, 772 (5th Cir. 2017) (finding plain error without precedent where the correct result was "plain from the face of the relevant statutes and regulations"). The proper result here is not so obvious where the only relevant case law identified and substantively engaged with by the parties is a single district court opinion, addressing the "derivative advice-of-counsel" issue in a different context.

Moreover, Rao has not demonstrated clearly the relevance of the testimony he sought to elicit. Although Rao now suggests that he sought to elicit Bugen's testimony to demonstrate that Rao lacked the required scienter, the record could be construed to indicate otherwise. Evidence that is not relevant is inadmissible, FED. R. EVID. 402, and even relevant evidence may be excluded "if its probative value is substantially outweighed by a danger" of "unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence," FED. R. EVID. 403. This court affords the district court "wide discretion in assessing the relevance and prejudicial effect of evidence." *United States v. Alaniz*, 726 F.3d 586, 606 (5th Cir. 2013) (quoting *United States v. Seale*, 600 F.3d 473, 494 (5th Cir. 2010)).

Here, it is not entirely clear what Rao's counsel meant when telling the district court, "We are not going to get up and say that Dr. Rao relied

upon those representations and therefore we are seeking an advice-of-counsel defense. . . . It goes to the effect on the listener." One reading, which the government urges, is that defense counsel represented that the defense would not argue that Rao relied on Bugen's statement about attorney vetting when agreeing to join ADAR Group. However, the statement alternatively could be interpreted to mean that Rao did not intend to press the advice-of-counsel defense on the basis that Bugen in fact *did* seek legal advice, giving Rao a colorable argument that this testimony was relevant to the element of scienter.

Still, on this record, and bearing in mind the "wide discretion" given to district courts "in assessing the relevance and prejudicial effect of evidence," *Alaniz*, 726 F.3d at 606 (quoting *United States v. Seale*, 600 F.3d 473, 494 (5th Cir.2010)), the district court's decision to exclude this line of testimony does not amount to "clear or obvious legal error," *Suarez*, 879 F.3d at 630. Rao fails to show that the district court plainly erred in precluding testimony regarding statements Bugen purportedly made to Rao concerning vetting of the scheme by an attorney.

IV

Finally, Rao challenges his sentence based on the district court's loss calculation under the Sentencing Guidelines. Rao argues that the district court erred in overruling his loss calculation objection because the court should only defer to Guidelines commentary if the relevant Guideline is ambiguous and because the word "loss" in § 2B1.1(b)(1) unambiguously means "actual loss." In the alternative, Rao argues that the district court erred in calculating the "intended loss" value because TRICARE has clear, publicly known reimbursement rates.

A

Rao preserved his challenge to the district court's loss amount calculation under the Sentencing Guidelines by objecting to the PSR and again at sentencing. Where a sentencing challenge is preserved, this court "review[s] the district court's interpretation of the Sentencing Guidelines de novo and its findings of fact for clear error." *United States v. Aderinoye*, 33 F.4th 751, 754 (5th Cir. 2022). "There is no clear error if the sentencing court's finding is plausible in light of the record as a whole." *United States v. Gomez-Alvarez*, 781 F.3d 787, 791 (5th Cir. 2015) (quoting *United States v. Cisneros–Gutierrez*, 517 F.3d 751, 764 (5th Cir. 2008)). Where a defendant "raises [a claim] for the first time on appeal," this court instead "appl[ies] the more deferential plain error review." *Aderinoye*, 33 F.4th at 754.

B

1

At the time of Rao's sentencing, § 2B1.1(b)(1) referred to "loss" without defining the term, but the official commentary to § 2B1.1 provided that "loss is the greater of actual loss or intended loss."[7] U.S.S.G. § 2B1.1 cmt. n.3(A) (2018). The Guidelines commentary further defined "actual loss" to mean the "reasonably foreseeable pecuniary harm that resulted from the offense" and defines "intended loss" to mean the "pecuniary harm that the defendant purposely sought to inflict," "includ[ing] intended pecuniary harm that would have been impossible or unlikely to occur." *Id.* § 2B1.1 cmt. n.3(A)(i)–(ii) (2018).

---

[7] Effective November 1, 2024, the Sentencing Guidelines were amended to, among other things, move the existing definitions for "loss," "actual loss," and "intended loss" from the commentary into the text of § 2B1.1.

In *Stinson v. United States*, the Supreme Court held that "commentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline."  508 U.S. 36, 38 (1993).  In the intervening thirty years since the Supreme Court decided *Stinson*, this court has held consistently that "loss" means the greater of "actual loss" or "intended loss," as directed by the Guidelines commentary to § 2B1.1(b)(1).  *See, e.g.*, *United States v. Dowl*, 619 F.3d 494, 502 (5th Cir. 2010) (per curiam).  Rao, however, contends that the district court nonetheless erred in deferring to the commentary because "courts should not defer to agencies' interpretations of unambiguous rules" under the Supreme Court's decision in *Kisor v. Wilkie*, 588 U.S. 558 (2019).

At the time of Rao's sentencing, this court had yet to address whether *Kisor* abrogated *Stinson*'s direction that courts generally defer to the Guidelines commentary.  The district court therefore adhered to this court's earlier decisions, applying the commentary's definition of "loss" to include "intended loss."  Just a month after Rao's sentencing, this court addressed the issue, holding that *Stinson* "has not been overruled or modified" and therefore still controls.  *United States v. Vargas*, 74 F.4th 673, 680 (5th Cir. 2023) (en banc), *cert. denied,* 144 S. Ct. 828 (2024).  Thus, the term "loss" in § 2B1.1(b)(1) continues to mean the greater of the "intended loss" or the "actual loss," as set forth in the Guidelines commentary and this court's longstanding interpretation of that provision.  *See, e.g.*, *Dowl*, 619 F.3d at 502 (observing that the commentary's direction that "loss is the greater of actual loss or intended loss" is "authoritative" under *Stinson*); *United States v. Kasali*, 111 F.4th 637, 648-49, 649 n.2 (5th Cir. 2024) (holding, post-*Vargas*, that it was not plain error for the district court to calculate the "loss" under § 2B1.1(b)(1) based on "intended loss").  The district court therefore did not

err by using the "intended loss" amount as the basis for the loss calculation here.

2

Rao argued before the district court that a downward variance was appropriate because, among other reasons, the $13 million intended loss amount overstated Rao's subjective intent. In support of his variance argument, Rao filed a declaration from a physician, Dr. James Alexander, stating that TRICARE would, and indeed did, only pay the rates established by its publicly available rate schedule. On appeal, Rao reframes this argument as one pertaining to the district court's offense level calculation under the Sentencing Guidelines, arguing for the first time that the district court erred in finding that the intended loss amount under the Guidelines "was meaningfully more than the actual loss." Because Rao failed to preserve this argument, it is subject only to plain error review. *Aderinoye*, 33 F.4th at 754.

"Intended loss" means "the pecuniary harm that the defendant purposely sought to inflict" and "includes intended pecuniary harm that would have been impossible or unlikely to occur." U.S.S.G. § 2B1.1 cmt. n.3(A)(ii) (2018). The Guidelines commentary further observes that the "sentencing judge is in a unique position to assess the evidence and estimate the loss based upon that evidence" and therefore notes that "the court's loss determination is entitled to appropriate deference." U.S.S.G. § 2B1.1 cmt. n.3(C) (2018). The government is required to "prove by a preponderance of the evidence that the defendant had the subjective intent to cause the loss that is used to calculate his offense level." *United States v. Sanders*, 343 F.3d 511, 527 (5th Cir. 2003).

In *United States v. Isiwele*, this court considered how this standard applied in the health care fraud context, where the defendant argued that the billed amounts overstated the intended loss amount because

Medicare/Medicaid had an applicable fixed fee schedule. 635 F.3d 196, 202-03 (5th Cir. 2011). Adopting the burden-shifting approach taken by the Fourth Circuit, we held that "the amount fraudulently billed to Medicare/Medicaid is prima facie evidence of the amount of loss the defendant intended to cause, but the amount billed does not constitute conclusive evidence of intended loss." *Id.* at 203 (cleaned up). Rather, "the parties may introduce additional evidence to suggest that the amount billed either exaggerates or understates the billing party's intent." *Id.* (quoting *United States v. Miller*, 316 F.3d 495, 504 (4th Cir. 2003)).

Rao does not dispute that the government met its initial burden by presenting evidence that TRICARE was billed more than $13 million for claims made under Rao's NPI number. Rao instead contends that the Alexander declaration, combined with the undisputed evidence that Rao did not submit the bills personally and that TRICARE pays claims using its fixed payment schedule, was sufficient to rebut the government's evidence and conclusively establish that the intended loss should have been based on TRICARE's fee schedule, rather than on the billed amounts.

None of this evidence, however, speaks directly to whether *Rao* subjectively knew about TRICARE's billing practices. It is not enough merely to establish that TRICARE uses a fixed payment schedule (an undisputed fact) or that Dr. Alexander (notably a retired serviceman) knows about that fixed schedule and believes that "it is widely known in the healthcare industry that government health insurance plans pay claims on the basis of a fee schedule of allowed amounts." Nor is it persuasive that Rao did not personally submit the bills to TRICARE. *See Willett*, 751 F.3d at 340 (observing that "[a] defendant need not have actually submitted the fraudulent documentation . . . in order to be guilty of health care fraud or conspiracy to commit health care fraud" (alterations in original) (citation omitted)).

In multiple post-*Isiwele* cases, this court has upheld district courts' use of billed amounts to measure intended loss where, as here, the defendants failed to proffer evidence addressing their subjective intent. For example, in *United States v. Usman*, the court held that the district court's intended loss calculation was not clear error, despite evidence of Medicare payment schedules, because no witness testified that the defendant "knew the details of Medicare's reimbursement formula and fee schedule" and the defendant testified that he had relied on others for billing because he believed they knew the billing rules, while he did not. 460 F. App'x 414, 417 (5th Cir. 2012). Similarly, in *United States v. Elliott*, the court found no clear error in the district court's reliance on the billed amount, despite "certain trial evidence that would have allowed the district court to infer Elliott's knowledge of Medicare's reimbursement schedule," because Elliott, when testifying, "never claimed that he intended or that he expected Medicare to pay less than the amount of the claims that he filed" and because the district court "expressly found that Elliott's self-serving affidavit after the fact [was] not persuasive." 600 F. App'x 225, 229-30 (5th Cir. 2015) (cleaned up) (quoting the district court's findings).

Here, as in *Usman*, Rao offered no evidence concerning *his* personal knowledge of TRICARE's reimbursement schedule. Moreover, although the district court's written analysis of this issue is understandably brief, given Rao's assurances that the Alexander declaration was relevant to his variance arguments, not his Guidelines arguments, the district court's written opinion and order demonstrates that the court considered, and evidently was not persuaded by, the pieces of evidence to which Rao now points. As relevant to the evidence that Rao did not personally submit claims, the district court correctly held that, under *Willett*, a "defendant who causes the submission of false and fraudulent claims to TRICARE is just as liable as a defendant who actually submits the claim." As relevant to the Alexander declaration, the

No. 23-10670

district court cited *Usman* in support of its conclusion that "the intended loss is the amount that Dr. Rao billed in fraudulent medical testing," noting parenthetically that *Usman* held "the physician defendant accountable only for the amount billed on Medicare fraud claims, as there was no evidence that he understood billing and reimbursement at significantly lower amounts."

Thus, Rao fails to demonstrate that the district court committed a "clear or obvious legal error," *Suarez*, 879 F.3d at 630, in calculating the intended loss and imposing the corresponding Guidelines enhancement.

\*    \*    \*

For the foregoing reasons, we AFFIRM Rao's convictions and sentence.